NATIONAL LABOR RELATIONS
· BOARD, Petitioner,

and

Linda Snider and Karin Lehrer,
Intervenors,

v.

NEW YORK TYPOGRAPHICAL UNION
NO. 6, Respondent.

No. 612, Docket 79–4126.

United States Court of Appeals,
Second Circuit.

Argued March 5, 1980.

Decided Sept. 3, 1980.

Joseph A. Oertel, Atty., N. L. R. B., Washington, D. C. (John G. Elligers, Atty.; Norton J. Come, Acting Gen. Counsel; John E. Higgins, Jr., Deputy Gen. Counsel; Robert E. Allen, Acting Associate Gen. Counsel; Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., on brief), for petitioner.

Marc J. Luxemburg, New York City (Harold L. Luxemburg, Luxemburg & Luxemburg, P. C., New York City, on brief), for intervenors.

Ronald Rosenberg, Washington, D. C. (George B. Driesen, Van Arkel, Kaiser, Gressman, Rosenberg & Driesen, Washington, D. C.; John J. Sheehan, New York City, on brief), for respondent.

Clifton, Budd, Burke & De Maria, New York City (Henry Clifton, Robert A. Wiesen, New York City, on brief), for Printers League Section, Printing Industries of Metropolitan New York, Inc., as amicus curiae.

Before FEINBERG, Chief Judge, NEWMAN and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

The National Labor Relations Board (the "Board") petitions pursuant to § 10(e) of the National Labor Relations Act ("NLRA" or the "Act"), 29 U.S.C. § 160(e) (1976), for enforcement of an order requiring the New York Typographical Union No. 6 (the "Union" or "Local 6") to, *inter alia*, cease and desist from maintaining and enforcing certain hiring hall procedures. The challenged procedures, adopted pursuant to a contract between respondent on the one hand, and the Printers League Section of Printing Industries of Metropolitan New York, Inc. (the "League") and approximately fifty non–League employers (the "Independents") on the other, establish an order of preference in job referrals for various groups of workers, and give first preference to "journeymen and apprentices working or seeking work in Book and Job shops under Contract" with the Union on the effective date of the contract. The Board found that the League members and the Independents did not constitute a single bargaining unit, and that the referral procedures give preference on the basis of prior employment in shops under contract with the Union rather than on the basis of seniority within a single bargaining unit; it concluded that these practices restrain and coerce employees in the exercise of rights guaranteed by § 7 of the NLRA, in violation of § 8(b)(1)(A), and discriminate against non–union employees in violation of § 8(b)(2). The Board's rulings invalidating certain of the job referral preferences have not been challenged by the Union, and are thus entitled to enforcement.

As to the findings of the Board that have been challenged here, we conclude that the record does not contain substantial evidence that the preferences to which they relate have the purpose or effect, on their face or as applied, of restraining employees in the exercise of their § 7 rights or impermissibly encouraging union membership by means of discrimination. Accordingly, we grant in part and deny in part the Board's petition for enforcement.

## I. FACTUAL BACKGROUND

### A. *The 1975 Book and Job Contract*

Since the late nineteenth century, Local 6 has been confronted with problems resulting from mechanization of the printing industry; [1] as early as 1890, the Union issued

---

1. The International Typographical Union ("ITU"), parent union to Local 6, was formed in 1852 and is the oldest national labor organization in the United States. For a detailed de-

a declaration recognizing the benefits of such "labor–saving" machinery as typesetting machines, but asserted the right to establish regulations for the employment of its members to run such machines.[2] The Union's response to technological change historically has emphasized Union control of new machines and training of existing journeymen in the operation of the new machinery. Computerization of typesetting compounded the threat to journeymen skilled in the older techniques. Modern electronic phototypesetters, through the use of computers, can automatically justify, hyphenate, and perform other tasks formerly performed by the skilled typographer. Use of such automatic machinery is likely not only to decrease the number of jobs available but also to lower the degree of skill required to perform the remaining work.

Within this context, the 1975 Book and Job Contract ("the Contract") was a joint effort by the Union and employers to minimize the adverse effects of automation on journeymen in commercial printing ("book and job") shops,[3] while accommodating the desires of employers to take full advantage of advances in technology. The employers in question were the approximately 150 members of the League, and approximately 50 non–League employers who had agreed in advance to be bound by the results of the negotiations between the Union and the League. In the 10–year contract,[4] executed on December 22, 1975, and effective retroactively to October 4, 1975, the Union for the first time abandoned nearly all prior contractual "manning" requirements in exchange for income protection for the employees. The principal thrust of the agreement was to open the doors of book and job shops to automation through use of "any and all computers," to provide for the training of employees in the skills needed to operate such equipment, and to require the payment of guaranteed income to certain unemployed or underemployed employees from a fund established by the employers. In light of the income guarantees, exclusive hiring hall procedures were instituted, and supervised by the fund's trustees, to give highest priority in job referrals to employees who were eligible for guaranteed income payments.

The pertinent provisions are set forth in a section of the Contract entitled "Productivity and Job Security Special Agreement" ("Special Agreement"). Article 1 of the Special Agreement provided for the payment to "guaranteed employees" of "that

---

scription of the history of automation in the printing industry and, more specifically, the Union's response to various technological advances, see H. Kelber and C. Schlesinger, *Union Printers and Controlled Automation* (1967).

2. *Id.* at 13.

3. "Book and job office" is defined in the Contract as follows:

An office which does printing for the public or for an individual firm or company, or one that operates a printing plant for the production of its own or others' weekly, semi–weekly, tri–weekly or monthly publications, whatever the equipment of the foregoing may be, or whatever hours of the day they may be operated.

Local 6 represents both book and job shop employees and newspaper shop employees.

The problem of introducing computer technology into the printing industry received considerable attention in the year prior to the Book and Job contract. On July 28, 1974, Local 6 approved an 11–year contract with the New York Daily News and the New York Times which "virtually clear[ed] the road for automa-

tion of newspapers in New York City" and "[c]lose[d] a long era of resistance to technology that saw the demise of many of the City's daily newspapers . . . ." "New York's ITU Settlement Clears Path for Automation," *Editor & Publisher*, Aug. 3, 1974 at 75. The contract followed 14 months of negotiations, and provided that employers would be permitted to introduce any technological advances in exchange for a guarantee of lifetime employment for current employees. The New York Times commented that "if the [new] contract marks a full turn towards rationality in bargaining, it also signals a slow slide into oblivion by the printers' union, now virtually doomed by its acceptance of the reality that automation is indispensable to newspaper survival." *New York Times*, July 29, 1974 at 12, col. 1.

4. The Contract provides for an initial 3–year term and, thereafter, two 3–year terms and one 1–year term. There are several options whereby the Union may cancel the contract or either party may submit certain proposed amendments to arbitration.

amount necessary to produce . . . after deductions . . . an amount equal to the take home pay of an employee working at the trade."[5] "Guaranteed employees" are defined as "regular situation holders and those diligently seeking work on October 4, 1975," who continue to seek and be available for full time employment in Book and Job shops covered by the Contract. The guaranteed income is to be paid out of the Benefit and Productivity Fund ("B.A.P. Fund"), a trust fund maintained by employer contributions.[6]

Article 2 required that all employment in shops covered by the Contract be handled through the hiring hall, which is run by the trustees of the B.A.P. Fund, and established the following priority for referrals of Book and Job branch journeymen and apprentices:[7]

> There shall be five designations of applicants for work who shall have preference for work in the order of "A", "B", "C", "D" and "E".
>
> "A" employees only are those guaranteed journeymen and apprentices working or seeking work in Book and Job shops under Contract with New York Typographical Union No. 6 as of October 4,

1975, as named in Exhibit A of the Contract.

> "B" employees are those journeymen and apprentices working or seeking work in Newspaper shops under Contract with New York Typographical Union No. 6 as of October 5, 1975 as named in Exhibit B of the Contract.
>
> "C" employees are those journeymen members of the International Typographical Union who make application for employment in the Book and Job Branch after date of ratification of this Contract.
>
> "D" employees are those journeymen whose place of work becomes organized and for whom contributions are made to the Fund after October 6, 1975 who make application for other employment in the Book and Job Branch after date of ratification of this Contract.
>
> "E" employees are all other employees who make application for employment after passing appropriate tests to determine their time at the trade and qualification as journeymen.

In addition, Article 2 established the priorities for employees seeking work as Graphic Arts Associates, i. e., clerical employees and skilled workers who had not obtained journeyman status:[8]

**5.** This amount has since been reduced to 80% of the take home pay of an employed worker.

**6.** The Contract originally required employers to contribute "an amount equal to ten percent (10%) of gross earnings for each employee covered by the Contract." In addition, the Contract stated: "Should additional contributions be required to meet the objectives of the Fund, the ten percent (10%) rate of employer contributions shall be increased but such increase shall not be implemented unless and until available procedures have been adopted by the Trustees [of the Fund] to maintain the financial integrity of the Fund." Apparently, the employers' contribution has been increased from 10% to 16%. Brief of Amicus Curiae at 3 n. 2.

**7.** The Contract defines "journeymen" as: "(1) persons who prior to the effective date hereof worked as journeymen in composing rooms covered by this Contract; (2) persons who have completed approved apprentice training as provided in this Contract, or who have passed a qualifying examination under procedures heretofore recognized by the Union and the Employers."

With respect to apprentices, a memorandum to the Contract stated in part:

> The parties, in anticipation of the need for new skills and training methods, have agreed to deletion of the Contract Sections concerning Apprentices .... They recognize, however, that future manpower requirements will make necessary an apprentice training program. At that time, the League and the Union pledge that there shall be no discrimination in the employment of apprentices. Apprentices shall be selected on the basis of qualifications and aptitudes without regard to race, creed, color, sex or national origin.

The memorandum also provided that apprentices employed at the time of contract ratification would continue to be covered under the terms of the prior contract.

Hereinafter, references to journeymen covered by the hiring hall procedures will include both journeymen and apprentices.

**8.** The Contract also included a provision, similar to the Graphic Arts Associates provision, covering Printing Utilities Branch (P.U.B.) employees. In *New York Typographical Union No. 6 and Clark & Fritts, Inc.*, 236 N.L.R.B. 317

It is agreed that effective January 1, 1976, no new employees will be hired to perform work under the terms of a Graphic Arts Associates Contract until all unemployed members of the Graphic Arts Associates Branch are employed. Thereafter, new employees shall be hired exclusively through a hiring hall.

There shall be two designations of applicants for work who shall have preference for work in the order of "A" and "B".

"A" employees are those Graphic Arts Associates working or seeking work in Book and Job shops under Contract with the Graphic Arts Associates Branch of New York Typographical Union No. 6 as of October 4, 1975.

"B" employees are those persons who do not qualify as "A" employees and who seek work as Graphic Arts Associates in accord with established hiring hall procedures after October 5, 1975.

"B" employees shall be available for work after such work has been made available to "A" employees except that they may, subsequent to their employment be bumped from employment by "A" employees who become available for work.

The Special Agreement introduced various other devices aimed at maximizing utilization of the existing work force in shops under contract with the Union. For the first time, for example, Local 6 agreed to provisions for mandatory and incentive retirement.[9] Other provisions were designed to encourage the retraining of existing employees on new machinery,[10] insure Union jurisdiction over new job classifications[11] and equipment,[12] and protect the integrity of the Fund.

## B. *The Intervenors*

The present petition has its origin in charges filed with the Board by intervenors Linda Snider and Karin Lehrer, challenging the categories established by Article 2 of the Special Agreement for Book and Job branch journeymen and apprentices, and for Graphic Arts Associates. The following facts are drawn from testimony at the administrative hearing and from the opinion of the Administrative Law Judge ("ALJ").[13]

In July 1977, Snider and Lehrer was employed at Typographical Directions Corporation, a non–unionized commercial printing

(1978), the Board found that the P.U.B. provision violated § 8(b)(1)(A).

9. Article 5 established 68 as the mandatory retirement age effective January 2, 1977 and provided a cash payment of $5,000 to those required to retire on that date. In addition, a payment of $10,000 was provided for guaranteed employees age 60 or over who elected to retire between January 1, 1976 and July 5, 1976. Local 6 President Powers testified that some 400 employees had accepted early retirement, receiving cash payments totaling approximately $4 million.

10. The Special Agreement created a Joint Committee on Training and Technology, comprised of Union and League members, and charged with the setting of standards for school training and on–the–job training. In addition, the Agreement provided that if a new classification in the work area of photo–composition caused lay–off of a senior employee, that employee "shall be given the opportunity to demand [school] training to acquire adequate preliminary skills" and, thereafter, "shall be eligible for full time on–the–job training ...." To insure that employees seek training, the Special Agreement stated that a guaranteed employee

"may be required to attend a special training program to raise his level of competency as a condition of maintaining eligibility for benefits from the Fund."

11. For example, Article 10 created "a new classification to be known as Computer Typist" and provided that "Computer Typists shall be members of the bargaining unit and shall be covered by the Contract and subject to Union Security provisions of this Contract."

12. Article 11, for example, provided that computers used for composing room work "shall be within the jurisdiction of the Union."

13. Not all of these facts have been conceded by the Union. However, the Union's argument before this Court is based not on assertions of error in the factual findings, but rather on the contention that "the Board's findings and order with respect to Snider and Lehrer rests on an erroneous premise: that the contract provision affording a hiring hall preference to employees on the guaranteed list was unlawful." Respondent's Brief at 20.

shop. For several years, they had participated in Local 6's efforts to organize that and other non–union shops. Both Snider and Lehrer claim that they had been issued union membership cards in March 1977, that their initiation fees had been waived, and that they had tried to pay their union dues on several occasions.[14]

On July 14, 1977, Snider accepted an offer from a League member, Royal Composing Room, Inc. ("Royal"), for employment as a computer keyboard operator. On July 20, 1977, however, Local 6 President Bertram Powers told Snider that he did not want her to work at Royal because of "trouble with training problems." He also stated that she and Lehrer were not yet Union members, and that if they became members they would be category C employees and would not be allowed to work in union shops so long as category A and B employees were unemployed. That same day, Powers told David Poleshuck, shop steward at Royal, who relayed the information to Royal vice president Leon Fershleiser, that Snider would not be able to go to work at Royal. On July 21, Powers sent a telegram to Snider which stated, "This is in confirmation of information provided to you yesterday that you are not yet eligible to seek work in composing room under contract with New York Typographical Union No. 6." Snider never obtained employment at Royal.

On July 18, 1977, Lehrer reported to Advertising Agencies Service Co., Inc. ("Advertising Agencies"), also a League member, for a job "try out." Apparently, the try–out was arranged pursuant to a suggestion by Powers.[15] Lehrer reported to Advertising Agencies again on the night of July 19, and claims that on that night Marvin Shadrin, plant manager at Advertising Agencies, offered her a job.[16] On July 21, however, Powers sent Lehrer a letter identical in content to the telegram sent to Snider, and Lehrer was never hired by Advertising Agencies.

It was undisputed that neither Snider nor Lehrer was a category A employee and that neither had any seniority standing at Royal or Advertising Agencies. Nor does there appear to be any question that there were substantial numbers of category A employees who were unemployed at the time.[17]

## C. The Administrative Proceedings

Snider and Lehrer filed charges with the Board on September 2, 1977, each claiming that the Union had "coerced and intimidated" her by preventing her from working in shops under contract with the Union. Their cases were consolidated, and the Board issued a complaint charging that the Union's hiring hall practices pursuant to the Contract were discriminatory and violated NLRA §§ 8(b)(1)(A) and (2), 29 U.S.C. §§ 158(b)(1)(A) and (2).

### 1. The Findings of the ALJ

A hearing was held before the ALJ, who received testimony from the intervenors, Powers, Fershleiser, Poleshuck and Shadrin. The ALJ found that the Union had committed unfair labor practices by maintaining the hiring hall procedures required by the Special Agreement and by applying them to Snider and Lehrer.

In his opinion, the ALJ set out the following standard for determining whether the

14. Powers claimed that Snider and Lehrer had never actually become Union members. Neither the ALJ nor the Board made any findings on this subject.

15. Powers testified that he wanted to obtain for Lehrer "some temporary employment in a union shop" for the purpose of "acquaint[ing] her with the way things run in a union shop so that she might be better able to help in organizing."

16. Shadrin testified, however, that Lehrer had not yet completed the testing, and that he did not recall offering her a job. The ALJ found Shadrin "an unreliable witness," and to the extent that Shadrin's testimony conflicted with that of Lehrer, the ALJ expressly credited Lehrer.

17. Powers testified that there were hundreds of unemployed category A employees. Royal alone, according to Poleshuck, had laid off some 30 employees who were on the guaranteed income list.

Union had committed unfair labor practices within the meaning of §§ 8(b)(1)(A) [18] and 8(b)(2): [19]

A collective–bargaining agreement providing for an exclusive hiring hall does not violate the Act unless the referral system is administered in a discriminatory or otherwise arbitrary manner. Thus, Section 8(b)(2) and (1)(A) of the Act is violated if in the operation of an exclusive hiring hall employees are denied referral to jobs because they are not members of the union or for some other arbitrary or irrelevant reason.

(Footnotes omitted.) Applying this test to the hiring hall procedures established pursuant to the Special Agreement, the ALJ had little difficulty in reaching the conclusion that the categories established for referral of Graphic Arts Associates and that the preferences accorded journeymen and apprentices in categories B, C, and D were unlawful. He noted that the hiring hall procedures for Graphic Arts Associates were "almost identical in language" to procedures for the Printing Utilities Branch, found unlawful by the Board in *New York Typographical Union No. 6 and Clark & Fritts Co., Inc.,* 236 N.L.R.B. 317 (1978). As to journeymen and apprentices in categories B, C, and D, the ALJ stated:

Employees in categories B, C and D, who are members of the Union, are given preference over employees in category E, who are not members of the Union. Such preferences constitute unlawful discrimination and therefore the Union by maintaining and sponsoring such hiring hall procedures violates Section 8(b)(1)(A) and (2).

The ALJ regarded the category A preference somewhat differently, since category A was composed only of those employees who were employed by League members or Independents as of October 4, 1975, or who had the status of laid off employees of League members or Independents on that date. The ALJ observed that "[i]f the intent of category A is to require that the employers shall recall their laid off employees before they hire new employees to fill vacancies, then a contractual provision which effectuates such intent would be lawful."

The threshold issue with respect to category A, according to the ALJ was whether the League and the Independents constituted a single bargaining unit, since "[r]ecall of laid off employees in a unit concept." Here, the ALJ found that the Independents had not merely adopted the agreement, but had manifested an "unequivocal intention" to be bound: the Independents had bound themselves in advance of negotiations, by long-standing agreements, to the result of League–Union negotiations; and several

---

**18.** Section 8(b)(1)(A) provides that "[i]t shall be an unfair labor practice for a labor organization or its agents . . . to restrain or coerce . . . employees in the exercise of the rights guaranteed in section 157 of this title . . . ." 29 U.S.C. § 158(b)(1)(A) (1976). Section 7 of the NLRA, as amended, 29 U.S.C. § 157 (1976) provides:

Employees shall have the right to self–organization, to form, join, or assist labor organizations, to·bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

**19.** Section 8(b)(2) provides:
(b) Unfair labor practices by labor organization

It shall be an unfair labor practice for a labor organization or its agents-

. . . (2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership . . . . 29 U.S.C. § 158(b)(2) (1976). Under § 8(a)(3), 29 U.S.C. § 158(a)(3) (1976), it is an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term of condition of employment to encourage or discourage membership in any labor organization . . . ."

provisions in the Contract served as evidence of a "community of interests" between the League and the Independents, such as those relating to distribution of various benefits, operation of the hiring hall, automation–related training, and income guarantees. The ALJ concluded that the League and the Independents constituted a single multiemployer unit, and noted that in *Ted Hicks and Associates, Inc.*, 232 N.L.R.B. 712 (1977), *enforced*, 572 F.2d 1024 (5th Cir. 1978), "in a factual setting similar to the instant proceeding the Board did not reject General Counsel's argument that 'Respondent delegated bargaining authority [to] . . . and became a member of the multiemployer unit.'"

Nevertheless, the ALJ concluded that the priority for category A employees was unlawful on its face. He offered two grounds for this conclusion: (1) category A, "as presently phrased," did not treat the guaranteed employees as laid off employees rather than new hires; and (2) "category 'A' is an integral part of the same hiring hall procedures which include other preferential categories that are unlawfully discriminatory." The ALJ concluded that:

> [b]y maintaining in effect and enforcing the hiring hall procedures in its contracts with Printers League Section, Printing Industries of Metropolitan New York, Inc., and other employers which contracts became effective as of October 4, 1975 and which procedures give preference in referrals for employment to applicants who are members of Respondent as against other applicants for employment, Respondent has engaged in unfair labor practices within the meaning of Section 8(b)(1)(A) and (2) of the Act.

In addition, the ALJ concluded that the Union's application of the hiring hall procedures to deny employment to Snider and Lehrer constituted further violations of §§ 8(b)(1)(A) and (2). In reaching this conclusion, he did not suggest that Snider and Lehrer should have been placed in category

A, or that they were denied employment in favor of Union members with less seniority in the trade, in the bargaining unit, or in the particular shop.

### 2. The Findings of the Board

In its Decision and Order, the Board affirmed the findings and conclusions of the ALJ with one exception, and appeared to base its decision on that exception. Stating its view that the ALJ's reliance on *Ted Hicks and Associates, supra*, was misplaced, the Board "reverse[d] the Administrative Law Judge's holding . . . that the Independent employers and League members in issue constitute a single multiemployer bargaining unit." The Board pointed out that in *Clark & Fritts, Inc., supra*, it had "interpret[ed] the very contract here in issue," in a way that "impliedly rejected the contention that, by agreeing in advance to be bound by future contracts negotiated by a union and a multiemployer association, an Independent employer becomes a member of a multiemployer unit." [20]

Thus, the Board concluded:

> Inasmuch as League members and Independent employers are not part of a single multiemployer unit, the preference in question is not based upon the seniority of work experience acquired by an employee in a single bargaining unit. Rather, it is based upon an employee's employment in a shop under contract with the Union. Therefore, it is directly related to membership in the Union. Such a provision discriminates in favor of union members over nonmembers and, consequently, restrains and coerces employees in the exercise of their Section 7 rights. Accordingly, we hold that, in maintaining this portion of the hiring hall agreement and in enforcing it to deny employment to Charging Parties Snider and Lehrer, Respondent violated Section 8(b)(1)(A) and (2) of the Act.

**20.** In *Clark & Fritts, supra*, the Board referred to both the case before it and *Ted Hicks* as cases involving "an employer, who was not a member of a multiemployer bargaining unit"

but "had signed a memorandum agreement which bound it . . . to future contracts negotiated by the Union and the multiemployer association." 236 N.L.R.B. at 317 n.1.

The Board adopted the ALJ's recommended order, which directs the Union to cease and desist from maintaining and enforcing the hiring hall procedures required by the Special Agreement, to cease and desist from causing or attempting to cause Royal, Advertising Agencies, or any other employer to deny employment to Snider or Lehrer, and to make whole Snider and Lehrer for the loss of earnings suffered by them.

### 3. *The Issues on This Petition*

The Union did not object before the Board to the ALJ's findings that preferences accorded to employees in categories B, C, and D, over employees in category E, are unlawful. Nor did it object to the findings of unlawful preferences with respect to Graphic Arts Associates. These findings and that portion of the Board's order which enjoins these preferences are, therefore, not in issue here. NLRA § 10(e).

The principal issue here is whether the preference accorded to category A employees over all other employees violates the Act. We conclude that it does not, and we deny enforcement of the Board's order insofar as it relates to category A.

## II. DISCUSSION

While the Board's finding that the category A preferences violate the Act appears to be based on its conclusion that the League employers and the Independents did not constitute a single bargaining unit, and while we disagree with this conclusion, our principal reason for denying enforcement with respect to category A is that the record lacks substantial support for the proposition that these preferences encouraged union membership by means of discrimination, or restrained employees in the exercise of their § 7 rights.[21]

As a general matter, § 7 of the Act guarantees to employees both the freedom to join a union and the freedom not to join a union.[22] Recognizing the importance of these freedoms, various other sections of the Act place restrictions on employers and on labor organizations "to insulate employees' jobs from their organizational rights." *Radio Officers' Union v. NLRB,* 347 U.S. 17, 40, 74 S.Ct. 323, 335, 98 L.Ed. 455 (1954). *See also NLRB v. Milk Drivers & Dairy Employees, Local 338,* 531 F.2d 1162, 1163 (2d Cir. 1976). Thus, § 8(a)(1) makes it an unfair labor practice for an employer to interfere with an employee's § 7 rights and, with certain provisos not pertinent here, § 8(a)(3) makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." Similarly, § 8(b)(1)(A) makes it an unfair labor practice for a union to restrain or coerce an employee in the exercise of his § 7 rights, and § 8(b)(2) makes it an unfair labor practice for a union "to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3)."

■ These sections, however, do not prohibit all acts that would have the effect of encouraging union membership; nor do they prohibit all acts that would have the effect of discriminating against non–union members: "only such [encouragement] as is

**21.** On review, the Board's findings are entitled to deference if they are supported by substantial evidence in the record as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

**22.** When originally enacted as part of the Wagner Act of 1935, §§ 7 and 8 guaranteed employees only the right to *engage in* organizational activities, and protected that right against interference by employers. 49 Stat. 452. The Taft–Hartley Act of 1947 expanded the guaranteed rights of employees to include the right to refrain from engaging in such activities, and protected that right against interference by both employers and unions. Title I, § 101, 61 Stat. 140. Section 8(b)(1)(A) of the NLRA, as amended, corresponds to § 8(a)(1); § 8(b)(2) corresponds to § 8(a)(3). While some of the cases discussed *infra* actually involved unfair labor practice charges against employers pursuant to §§ 8(a)(1) and (3), the standards established in those cases apply equally to charges against labor organizations pursuant to §§ 8(b)(1)(A) and (2). *Cf. Local 357, Internat'l Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers v. NLRB,* 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961).

accomplished by discrimination is prohibited[, and] . . . only such discrimination as encourages or discourages membership in a labor organization is proscribed." *Radio Officers' Union v. NLRB, supra,* 347 U.S. at 42–43, 74 S.Ct. at 337; *B. G. Costich & Sons, Inc. v. NLRB,* 613 F.2d 450, 454 (2d Cir. 1980). Thus, if conduct of a union does not both discriminate against non–union employees and encourage union membership, it does not violate the above provisions. For example, as the ALJ recognized, an exclusive union hiring hall may encourage union membership, but it is not unlawful if there is no evidence of "discrimination either by the employers or unions that encourages or discourages union membership." *Local 357, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers v. NLRB,* 365 U.S. 667, 674, 81 S.Ct. 835, 839, 6 L.Ed.2d 11 (1961) (footnote omitted).

■ Further, "it is not sufficient merely to demonstrate discriminatory conduct and resulting encouragement or discouragement. Rather, 'the added element of unlawful intent is also required.' " *B. G. Costich & Sons v. NLRB, supra,* 613 F.2d at 454. But while unlawful motive is a necessary element of a violation of these sections, "no inquiry into motivation is necessary unless that conduct is first found to have encouraged or discouraged union membership, *Radio Officers' Union v. N.L.R.B., supra,* 347 U.S. at 45, 74 S.Ct. at 338, or at the very least, until it is shown that the conduct 'could have adversely affected employee rights to *some* extent . . . .' *N. L. R. B. v. Great Dane Trailers, Inc.,* [388 U.S. 26, 34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967)] (emphasis in original)." *Id.* at 455.

In addressing the threshold question of whether the challenged provision discriminates against non–Union employees and thereby encourages employees to join the Union, we must look for real evidence from which to draw realistic inferences, for mere speculation will not support a finding of violation. *See, e. g., B. G. Costich & Sons v. NLRB, supra; Truck Drivers Local Union No. 807 v. NLRB,* 506 F.2d 1382 (2d Cir.

1974). *Costich* dealt with an employer who made contributions to a retirement fund on behalf of its casual employees who were union members, but did not make similar contributions on behalf of casuals who were non–union. Clearly this action discriminated between union and non–union employees; but because the benefit to union employees consisted of only 30 days of employer contributions and could not be realized by new union members for at least 15 years, we could not realistically accept the Board's contention that it "inherently" encouraged union membership. *Truck Drivers Local Union No. 807 v. NLRB, supra,* involved a pension plan which permitted the trustees to grant a year of pension credit for each year of union membership prior to 1937 in lieu of requiring the employee to prove his covered employment for that period. The Board argued that this was a per se violation of §§ 8(b)(1)(a) and 8(b)(2), because it was " 'reasonable to infer that current employees could conclude from the preference accorded pre–1937 union members in obtaining pension benefits *now* that it would be advantageous to become and remain union members in good standing with the expectation that their membership status may be similarly rewarded in the future.' (Emphasis in the original.)" *Id.* at 1385. Enforcement of the Board's order was denied because it was wholly unrealistic to suppose that current employees would be encouraged to join the union by the expectation that in the years to come there would be either an amendment to grant the pre–1937 benefits to them, or a new contract with a comparable provision for their benefit. We found such a possibility "utterly remote and speculative," and refused to "predicate a finding that a party is in violation of the law upon such a gossamer–like theory." *Id.*

■ In the present case, the Board's conclusion of unlawfulness fails to meet the threshold test for two reasons. First, there is insufficient evidence to support a finding that the preference for category A employees in fact discriminates against non–Union employees. Notwithstanding the ALJ's de-

scription of category A as "embracing only union employees" (Decision at 7), the Contract does not, on its face, require that "A" employees be Union members.[23] And in fact at least one of the 3700 employees in that category is *not* a member of the Union.[24] Nor is category A priority granted to all Union members, or even to all employees working in Union shops. Thus, the Special Agreement, applying a uniform standard to all, allows some Union members and some non–members to be treated equally as "A" employees; and, applying the same standard, it excludes some Union members and some non–members from category A.

More importantly, even if category A were, on its face or as a practical matter, limited to Union members, there is no rational basis for inferring that the preference given to "A" employees has the effect of encouraging Union membership, because priority is accorded only to those employees who were working or seeking work in a shop under contract with the Union *as of October 4, 1975.*[25] Thus the class benefited here is closed to new members. Indeed it was a closed class prior to the date the Contract was finalized. One cannot gain this benefit by joining the Union. And it is unlikely that a similar benefit will be accorded new Union members in future contracts, since the provision was part of an effort by the Union to minimize the potential adverse impact of automation, to which the doors were opened wide in 1975. It can be expected that throughout the term of this 10–year contract, as experienced "hot–type" typographers retire or become trained on new "cold–type" machines, the need for such special protections will diminish. We are no more inclined to accept as reasonable a suggestion that employees will be encouraged to join Local 6 in the expectation that in some future contract or amendment they may be included in category A or its analogue, than we were to accept a similar suggestion in *Truck Drivers Local Union No. 807 v. NLRB, supra.*

Moreover, we are forced to conclude that the record does not support the Board's argument that the category A preferences were established for an improper motive. It cannot seriously be disputed that the category A preferences serve the crucial and direct purpose of protecting the integri-

---

**23.** The category A preference differs in this respect from the provisions for Graphic Arts Associates and Printing Utilities Branch employees, provisions found by the Board to violate the NLRA. Both of those provisions state that no new employees will be hired until all "members" of the relevant "Branch" are employed, thus seemingly giving priority to all Union members.

That all but one of the members of category A appear to be Union members may be attributable to the inclusion of a union security clause in the contracts between the League and the Union. This clause, permissible under the proviso of § 8(a)(3), provides that new employees must join the Union on the thirtieth day after commencement of employment and requires them "as a condition of continued employment to continue membership in the Union . . . ."

**24.** At the hearing the ALJ repeatedly stated, that there was *only* one non–Union employee in category A. Powers' testimony was that he knew personally of one such employee and that there may be others.

**25.** The Board asserts that, according to Powers' testimony, newly organized workers could be added to category A. There is no evidence that this has ever been done. Furthermore, al-

though his testimony is somewhat confusing, we understand Powers' testimony to mean that newly organized employees could be granted guaranteed income benefits, but not necessarily the job referral preference of category A. Our interpretation finds support in the Contract itself. The two provisions discussed in the testimony were as follows:

When shops become organized, employees may become eligible for all benefits under the Contract provided that regular contributions shall be required by the Contract and that a waiting period shall be determined by the Trustees before the employees . . . shall become eligible for benefits.

Article 1; and,

"B", "C", "D" and "E" employees shall only become Guaranteed Employees entitled to the *income and discharge provisions* of this Contract after a significant number of shifts worked for covered employers . . . .

Article 2 (emphasis added). Neither provision states that category A can be expanded for purposes of job referral, and category A is not defined to include all guaranteed employees, but only "those guaranteed journeymen and apprentices working or seeking work . . . as of October 4, 1975."

ty of the B.A.P. Fund. The 3700 employees in category A were guaranteed income in amounts equal to the take–home pay of an employed worker. For each guaranteed employee who is unemployed, therefore, the B.A.P. Fund must pay out a substantial sum of money. Whenever a non–guaranteed employee is hired, the B.A.P. Fund simply loses an opportunity to decrease its guarantee payments. Accordingly, the ALJ observed that the category A preferences are "designed to encourage the employment of the guaranteed employees" so that "the Fund [may] remain solvent and not be an onerous burden on the industry." And it must be recognized that the broader purpose of the category A preferences was to aid in the implementation of the laudable goal of opening the doors of book and job shops to automation, while minimizing the potentially devastating effects of the new technology on skilled journeymen. The preference for guaranteed employees is but one integral component in the carefully drawn plan to achieve these ends–a plan that not only guarantees income, and therefore gives job referral priority to the category A guaranteed employees, but also provides for the training of those employees and requires them to undergo such training as a condition of their eligibility to receive the guaranteed payments.

In the absence of any evidence that the Union's conduct actually encourages union membership or that it stems from unlawful motives, we can hardly enforce an order that upsets a carefully devised solution to problems previously recognized by this Court as "some of the most difficult for employees, unions, employers, and courts alike." *Ryan v. New York Newspaper Printing Pressmen's Union No. 2*, 590 F.2d 451, 452 (2d Cir. 1979).

 Although it is not essential to our decision, we are constrained to note further our view that the Board's finding that the League and the Independents did not constitute a single bargaining unit is not supported by substantial evidence. Whether or not different employers belong to the same bargaining unit depends principally upon the consent of the employers. *See, e. g., NLRB v. Sheridan Creations, Inc.,* 357 F.2d 245, 248 (2d Cir. 1966), *cert. denied,* 385 U.S. 1005, 87 S.Ct. 711, 17 L.Ed.2d 544, *rehearing denied,* 386 U.S. 969, 87 S.Ct. 1018, 18 L.Ed.2d 126 (1967). The test used by the Board and approved by the courts is whether or not the employer has indicated an "unequivocal intention" to be a part of the bargaining unit. *See, e. g., McAx Sign Company, Inc. v. NLRB,* 576 F.2d 62 (5th Cir. 1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979); *NLRB v. Beckham, Inc.,* 564 F.2d 190, 192 (5th Cir. 1977); *NLRB v. Dover Tavern Owners' Ass'n,* 412 F.2d 725, 727 (3d Cir. 1969). The court in *NLRB v. Beckham, Inc., supra,* stated as follows:

> The test is whether the employer members of the group have indicated from the outset an unequivocal intention to be bound by group action in collective bargaining, and whether the union, being informed of the delegation of bargaining authority to the group, has assented and entered into negotiations with the group representative.

564 F.2d at 192. The Board, in *Ruan Transport Corp. and District Lodge No. 77, International Association of Machinists and Aerospace Workers,* 234 N.L.R.B. 241 (1978), summarized the test as follows:

> The Board has consistently held that "the essential element warranting the establishment of multiple–employer units is clear evidence that the employers unequivocally intend to be bound in collective bargaining by group rather than by individual action. The correlative standard for excluding an employer from such a unit is evidence of an intent to pursue an individual course of action with respect to labor relations." As a general rule, the Board has found that an employer does not become a part of a multiemployer bargaining group (i. e., it does not intend to be bound by group bargaining) where it merely adopts a collective–bargaining agreement in the negotiation of which it did not actually participate and which it did not authorize another to negotiate on its behalf.

*Id.* at 242 (footnotes omitted), quoting *Pacific Metals Company, Ltd.*, 91 N.L.R.B. 696, 699 (1950).

There is no indication in the present record that the Independents merely adopted a contract they had not authorized others to negotiate. To the contrary, the evidence of record points overwhelmingly to an intention on the part of the Independents to be bound with League members. Powers testified that the Independents had "signed in advance of this negotiation an agreement that they will abide by this agreement when it will be reached." Thus, the ALJ found that the Independents "bound themselves in advance of negotiations by agreements of a continuing nature to be parties to the contracts entered into by the League and the Union." (Decision at 9.)[26] It is evident also that both the League and the Union consented to the Independents' joining the employer group, for the very agreement that the League and the Union negotiated provided for participation by non–League employers. For example, employees of the Independents were treated as guaranteed employees, entitled under the Contract to training on the new equipment and to benefits from the B.A.P. Fund. Employees of League members and Independents alike were listed in Exhibit A to the contract, which specified precisely who the category A employees were. Further, Article 14 of the Special Agreement required the establishment of an account titled "Typographical Union No. 6–Printers League Joint Administrative Account" to receive contributions from "an employer, signatory to this Contract, [which] is *not a member of the League.*" (Emphasis added.) Individual signing of the contract does not appear to have been contemplated; Powers testified that "the minute" the Contract was signed, it was signed for both "League shops and non–League shops."[27]

Rather than citing evidence, the Board points only to its view that the ALJ misconstrued the Board decisions in *Ted Hicks* and *Clark & Fritts.* Whatever the Board may have decided with regard to the intentions of other respondents in other cases,[28] we conclude that the Board's finding here is not supported by substantial evidence in the record as a whole.

*Application of the Hiring Hall Procedures to Intervenors*

Finally we turn to that portion of the Board's order which requires the Union to make whole Snider and Lehrer for the

26. We are aware that the Board should be upheld if there is substantial support in the record for its findings, even if the ALJ has made contrary findings. *See Universal Camera Corp. v. NLRB, supra*, 340 U.S. at 496, 71 S.Ct. at 468; *NLRB v. Donald E. Hernley, Inc.*, 613 F.2d 457, 461–62 (2d Cir. 1980). In this case, however, there is no substantial support in the record for the Board's findings.

27. *Compare, e. g., Photographers Local 659*, 197 N.L.R.B. 1187, 1189 (1972), in which the Board was persuaded that the employers were separate units, because "[i]t is not until the Independents have received the proposed agreement and discussed it that each Independent individually decides whether or not to become a party to the agreement."

28. Although *Clark & Fritts* describes the history of only that particular employer's involvement with the League and Union, *see* note 20 *supra*, the Board points to these facts as typical of "how Independent employers become bound by the multiemployer Contract." Petitioner's Brief at 3 n.3. We see no such evidence in the present record.

All of the other decisions cited by the Board are easily distinguishable. In *Ruan Transportation Corp., supra*, the employer's conduct "clearly demonstrate[d] that it did not intend to pursue group bargaining." The evidence showed that the employer had bargained extensively with the Union "on an individual basis." 234 N.L.R.B. at 242–43. In *Ted Hicks, supra*, the Board noted that the respondent employer, which it concluded was bound by the contract between the Union and multiemployer unit but not part of the unit, "had no prior history of group bargaining . . . ." 232 N.L.R.B. at 713 n.3. In *Phoenix Air Conditioning, Inc.*, the ALJ appears to have assumed, without pointing to any relevant facts, that the respondent employer was part of the bargaining unit. The Board rejected this assumption, stating that the "Respondent merely adopted an area agreement in the negotiation of which it did not participate" and that "[t]his action, without more, falls short of making Respondent a part of the multiemployer bargaining unit" (footnote omitted). 231 N.L.R.B. 341, 341–42 (1977).

lost earnings resulting from application of the hiring hall procedures to them. Given our conclusion that the category A preference is not unlawful on its face, and despite the fact that the category B, C, and D preferences must be accepted here as unlawful, we conclude that the record does not support this portion of the Board's order.

It is undisputed that neither Snider nor Lehrer was a category A employee, and there is no claim that they should have been included in that group. It is not clear whether they were in category C (Union journeymen) or category E (non–Union employees), but in either event there is no evidence that Snider and Lehrer were denied employment because of their non-membership in the Union;[29] they were told that even as "C" employees they would not be able to work in Union shops because there were "A" people unemployed. Nor does the record suggest that employees in categories B through D were given job referrals in preference to Snider and Lehrer. On the contrary, the record suggests that since 1975 there have always been hundreds of unemployed "A" employees, and there is, therefore, no basis for inferring that any employees in categories B, C, and D were given referrals at all.

Accordingly, since there is no evidence that the lawful preference for category A employees was applied to the intervenors unlawfully, nor any evidence that the unlawful preferences for category B, C, and D employees were applied to them at all, we must conclude that the record fails to provide substantial evidence to support the Board's finding that the Union committed unfair labor practices in causing the denial of employment to the intervenors.

## CONCLUSION

The Board's petition for enforcement is denied insofar as it enjoins use of the category A preferences and orders the Union to "make whole" Snider and Lehrer, and in all other respects is granted.

---

**29.** While Powers took the position that Snider and Lehrer were not members, he told them that even if they were members they would be in category C, and could not work in Union shops so long as "A" and "B" workers were unemployed. It also appears from the transcript that the ALJ, on occasion, restricted testimony to exclude any evidence as to the application of the hiring hall procedures to employees other than Snider and Lehrer or as to what type of employees, if any, were hired in place of the intervenors. Apparently, the ALJ took the position that such evidence, while possibly relevant to a claim that otherwise lawful procedures were unlawful as applied, was not relevant to the Board's complaint in this case.