192 F.3d 250 (2nd Cir. 1999)
 BERMUDA CONTAINER LINE LTD., Plaintiff-Counter-Defendant-Appellant,
v.
INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO and NEW YORK SHIPPING ASSOCIATION, INC., Defendants-Counter-Claimants-Appellees.
 Docket No. 99-7164
August Term, 1998
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: June 28, 1999
Decided: September 17, 1999
 
 Appeal from judgment of the United States District Court for the Southern District of New York (Keenan, J.) granting summary judgment motion of International Longshoremen's Association and New York Shipping Association, Inc. and dismissing Bermuda Container Line's lawsuit to vacate an adverse arbitration award. Because defendants did not violate Section 8(e) of the National Labor Relations Act, we affirm the judgment of the district court.
 Affirmed.[Copyrighted Material Omitted]
 PAUL D. INMAN, Klein, Zelman, Rothermel & Dichter, L.L.P., New York, N.Y. (Andrew E. Zelman, on the brief), for Plaintiff-Counter-Defendant-Appellant.
 DONATO CARUSO, Lambos & Junge, New York, N.Y. (C. Peter Lambos, on the brief), for Defendant-Counter-Claimant-Appellee New York Shipping Association, Inc.
 ERNEST L. MATHEWS, Gleason & Mathews, P.C., New York, N.Y. (Thomas W. Gleason, on the brief), for Defendant-Counter-Claimant-Appellee International Longshoremen's Association, AFL-CIO.
 Before: KEARSE, STRAUB, and POOLER, Circuit Judges.
 POOLER, Circuit Judge:
 
 
 1
 Bermuda Container Line Ltd., ("BCL") appeals from the amended opinion and order of the United States District Court for the Southern District of New York (John F. Keenan, Judge) granting defendants' motion for summary judgment and dismissing BCL's lawsuit to vacate an arbitration award in favor of the International Longshoremen's Association, AFL-CIO ("ILA"). Judge Keenan also dismissed BCL's claims of fraud and antitrust violations against the New York Shipping Association, Inc. ("NYSA"). BCL primarily argues that because it was not an employer within the common law meaning of the term, it was not a party to the Master Contract that the ILA enforced through arbitration. BCL also claims that the ILA violated Section 8(e) of the National Labor Relations Act ("NLRA") because it used provisions in the Master Contract to achieve objectives outside the primary employment relationship. For the reasons that follow, we reject these contentions and affirm the judgment of the district court.
 
 BACKGROUND
 
 2
 BCL is a publicly traded Bermuda corporation that ships goods between Hamilton, Bermuda and the port of New York on a weekly basis. The ILA is a union representing longshoremen on the Atlantic and Gulf coasts. Beginning in 1989, BCL contracted for marine terminal services with Maher Terminals, Inc. ("Maher Terminals"), a stevedore company that employs ILA longshoremen. BCL and Maher are members of NYSA, a management association that represents its members in the negotiation and administration of collective bargaining agreements with unions including the ILA. NYSA members authorized the association to negotiate with the ILA and agreed to adhere to the resulting collective bargaining agreement. Collective bargaining in the shipping industry has evolved into a two-step process. First, NYSA and other port associations combine to negotiate a multi-port Master Contract with the ILA regarding basic terms of employment. Second, ILA locals negotiate agreements with their respective port associations to fill in remaining terms. NYSA bylaws require all NYSA members to adhere to any contract that NYSA and ILA negotiate unless the member withdraws from NYSA before contract negotiations begin.
 
 
 3
 BCL was a member of NYSA in 1995, when negotiations began for the Master Contract at issue on this appeal. In early 1996, ILA began a grievance proceeding against BCL based on BCL's anticipated move from the port of New York to the port of Salem, New Jersey, where the ILA does not represent longshoremen. The ILA claimed that BCL violated a provision of the 1996 Master Contract known as the Containerization Agreement which preserved certain jobs for union workers.[1] The Master Contract incorporates the "Management-ILA Rules on Containers," which is an agreement by and between the carrier and direct employer members of the Management Port Associations and the ILA, as well as the union's Atlantic Coast District, its South Atlantic and Gulf Coast District and affiliated local unions. The preamble of the Rules on Containers provides in part:
 
 
 4
 Management agrees that it will not directly perform work done on a container waterfront facility. . . or contract out such work which historically and regularly has been & currently is performed by employees covered by management-ILA Agreements. . . unless such work on such container waterfront facility is performed by employees covered by Management-ILA Agreements.
 
 
 5
 The Master Contract reaffirms at sections 11 and 12 that ILA employees have "jurisdiction over longshore. . . and other ILA craft work conferred on such workers by the Containerization Agreement, set forth in the Appendix." Sections 1 and 2 of the Containerization Agreement state:
 
 
 6
 NYSA, CONASA [Council of North Atlantic Shipping Associations] and the Carriers recognize the existing work jurisdiction of ILA employees covered by their agreements with the ILA over all container work which historically has been performed by longshoremen and all other ILA crafts at container waterfront facilities. Carriers, direct employers and their agents covered by such agreements agree to employ employees covered by their agreements to perform such work. . . . NYSA, CONASA, the Carriers, the direct employers and their agents shall not contract out any work covered by this agreement. Any violations of this provision shall be considered a breach of this agreement.
 
 
 7
 As noted, BCL could have avoided being bound by this Master Contract if it had withdrawn from NYSA membership. BCL had appropriate notice and opportunity to withdraw from the association but did not do so. BCL alleges in its complaint that in July 1995 BCL informed NYSA that BCL planned to change docking locations from New York to Salem, and NYSA alerted the company to no potential contract violations. By letter dated August 8, 1995, NYSA informed BCL that the 1996 Master Contract negotiations would begin on November 9, 1995. In the same letter, NYSA reminded members that the collective bargaining agreement would bind them unless they withdrew from NYSA before negotiations began. BCL did not withdraw from NYSA at that time and proceeded with its plans to relocate ports.
 
 
 8
 The ILA filed a grievance with the Local Industry Grievance Committee ("LIGC") on May 21, 1996, claiming that BCL's proposed move to Salem would violate the Containerization Agreement in the Master Contract. BCL sought a preliminary injunction to stay the grievance hearing, but the district court denied the motion. See Bermuda Container Line, Ltd. v. ILA & NYSA, 1996 WL 297082 (S.D.N.Y. June 4, 1996). By a decision dated June 10, 1996, the LIGC sustained the union's grievance. The LIGC concluded that BCL was free to relocate to Salem but would incur liquidated damages of $2,000 for each container that non-ILA workers handled there because BCL's actions would be a willful violation of the Master Contract. On November 21, 1996, the Industry Appellate Committee ("IAC") affirmed the LIGC's decision. On June 20, 1996, BCL formally resigned and withdrew from NYSA. NYSA accepted BCL's resignation and reminded BCL that because it did not resign before negotiations for the 1996 Master Contract began, BCL was bound by that agreement.
 
 
 9
 BCL then filed an unfair labor practice charge against the ILA with the National Labor Relations Board ("NLRB"). BCL claimed that the union violated Section 8(e) of the NLRA when it filed a grievance and/or obtained an arbitration award against BCL because the ILA converted the Master Contract's no subcontracting clause into an unlawful union signatory clause that applied outside of the New York port. The NLRB referred BCL's charge to the Division of Advice of the Office of General Counsel, which issued an advice memorandum on December 13, 1996. The General Counsel's office found that BCL as a member of NYSA belonged to a multi-port bargaining unit along the Atlantic and Gulf Coasts and was bound by the Master Contract, which applied within the entire coast-wide bargaining unit. The General Counsel's office found that the containerization provisions of the Master Contract were valid work preservation provisions that required BCL to use unit employees to service its ships in Salem which is within the coast-wide bargaining unit. The General Counsel's office recommended that the NLRB dismiss BCL's charge against the union. The same office rejected BCL's request for reconsideration.
 
 
 10
 BCL filed this lawsuit in federal court on February 21, 1997, seeking to vacate the arbitration award in favor of the ILA and charging the NYSA with fraud and antitrust violations. In its amended complaint, BCL alleged that the arbitration award was invalid because the agreement on which it relied violated Section 8(e) of the NLRA. BCL also alleged various antitrust violations against the ILA and NYSA pursuant to sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Finally, BCL alleged fraudulent concealment and breach of fiduciary duty against NYSA. Specifically, BCL claimed that NYSA learned of BCL's proposed relocation at a meeting in 1995 but concealed the fact that the Master Contract prohibited the action. BCL claimed that it relied on NYSA's silence to its detriment. On December 29, 1997, the district court denied BCL's motion for summary judgment and found that the Containerization Agreement was a valid work preservation provision. See Bermuda Container Line Ltd. v. ILA & NYSA, 1997 WL 795766, at *6 (S.D.N.Y. Dec. 29, 1997). The district court concluded that BCL was a party to the Master Contract because it had delegated to NYSA authority to bargain. See id. at *9.
 
 
 11
 Thereafter, defendants moved for summary judgment. On February 8, 1999, Judge Keenan granted summary judgment to ILA and NYSA because there was no material issue of fact as to "whether BCL expressed the unequivocal intent to be bound by the NYSA's actions." Bermuda Container Line Ltd. v. ILA & NYSA, 1999 WL 64305, at *4 (S.D.N.Y. Feb. 8, 1999). It was undisputed that BCL joined NYSA in 1979, authorized NYSA to bargain with the ILA on its behalf, and failed to resign from NYSA until after negotiations on the 1996 contract began. See id. Judge Keenan held that BCL therefore was bound by the Master Contract that governs the handling of containers at all ports on the Atlantic and Gulf coasts. See id. The district court also held that the Containerization Agreement was a valid work preservation provision and confirmed the arbitration award. See id. The district court dismissed plaintiff's remaining antitrust and fraud claims. BCL now appeals.
 
 DISCUSSION
 
 12
 I. Summary judgment dismissal of action and confirmation of arbitration award
 
 
 13
 In reviewing a district court's decision refusing to vacate or confirming an arbitration award, we examine legal conclusions de novo and findings of fact for clear error. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 948 (1995); see also DiRussa v. Dean Witter Reynolds, Inc., 121 F.3d 818, 821 (2d Cir. 1997), cert. denied, 118 S. Ct. 695 (1998). "[A]rbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp., 103 F.3d 9, 12 (2d Cir. 1997) (quotation and citation omitted). The Federal Arbitration Act ("FAA"), 9 U.S.C. §10, lists several grounds on which a district court may vacate arbitration awards, none of which BCL invokes.[2] Instead, BCL argues that the arbitration award should be vacated as contrary to public policy because it "seeks to enforce a collective bargaining agreement provision that is illegal under the [NLRA]." Perma-Line Corp. of America v. Sign Pictorial and Display Union, Local 230, 639 F.2d 890, 895 (2d Cir. 1981); see also Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 83-84 (1982) (federal court has duty to consider legality of collective bargaining agreement before enforcing it).
 
 
 14
 BCL rests its challenge on Section 8(e) of the National Labor Relations Act ("NLRA") which states:
 
 
 15
 It shall be an unfair labor practice for any labor organization and any employer to enter into any contact or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible [sic] and void.
 
 
 16
 29 U.S.C. §158(e). This section of the NLRA was meant to prohibit secondary boycotts. See National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 634-636 (1967). A provision does not violate Section 8(e) if, based on all the surrounding circumstances, the clause at issue is "primary" in nature because it is "addressed to the labor relations of the contracting employer vis-a-vis his own employees." Id. at 645. The provision does violate Section 8(e) if it is "secondary" in nature, i.e., it is addressed to other relationships. See id. "[T]he union's purpose is primary in nature if the clauses were designed to preserve or protect the work of the affected employees; if to satisfy union objectives elsewhere, the union's purpose is secondary in nature and therefore objectionable." R.M. Perlman, Inc. v. New York Coat, Suit, Dresses, Rainwear & Allied Workers' Union Local 89-22-1, 33 F.3d 145, 154 (2d Cir. 1994); see National Woodwork, 386 U.S. at 644-45. In other words, "[i]f the object of the agreement is to benefit the employees of the bargaining unit represented by the union, it is 'primary' and in such event does not fall within the proscription of §8(e), whereas if the object is the application of pressure on an outside employer in order to require him to accede to union objectives it is 'secondary' and within the prohibition of §8(e)." A. Duie Pyle, Inc. v. NLRB, 383 F.2d 772, 776 (3d Cir. 1967) (footnote omitted). In short, a lawful work preservation agreement is (1) aimed at preserving work that union-represented employees in the bargaining unit traditionally perform, and (2) directed at work over which the contracting employer has control. See NLRA Bd. v. ILA, 447 U.S. 490, 504-05 (1980).
 
 
 17
 BCL asks this court to vacate the arbitration award because the Containerization Agreement is an illegal union signatory agreement designed to achieve secondary union objectives outside the primary employment relationship. According to BCL, an industry-wide bargaining unit is not the appropriate measure of the primary employment relationship when the unit is many times larger than the work force of the primary employer, which has little contact with the majority of the bargaining unit employees. See NLRB v. National Maritime Union, 486 F.2d 907, 914 (2d Cir. 1973). According to BCL, enforcement of the Containerization Agreement beyond the direct employees of Maher Terminals to the coast-wide bargaining unit violates Section 8(e) because the ILA is using the agreement to achieve secondary objectives outside the primary employment relationship. Alternatively, BCL argues the district court overlooked issues of fact as to whether a coast-wide bargaining unit existed, its scope and whether BCL consented to it.
 
 
 18
 The district court properly refused to vacate the arbitration award. We hold that BCL was bound by the Containerization Agreement, which was a valid work preservation provision aimed at saving work for ILA members on a coast-wide basis. The 1996 Master Contract explicitly stated that it was a "full and complete agreement on all issues relating to the employment of longshore employees on container and ro-ro[3] vessels and terminals in all ports from Maine to Texas. . . ." The agreement also provided that "[t]he ILA's Master Contract jurisdiction continues on a multi-port bargaining unit basis covering all ports from Maine to Texas at which ships of the [Carriers Container Council, Inc.] carriers and subscribers may call." The NYSA-ILA General Cargo Agreement also states that BCL is a party to the Master Contract covering all ports on the Atlantic and Gulf coasts from Maine to Texas. This inclusive language indicates that the agreement not only defined the bargaining unit but also the primary employment relationship on a coast-wide basis. We reject BCL's attempt to narrow the employment relationship to include only employees of Maher Terminals. The Containerization Agreement was designed to preserve the work of ILA employees in the coast-wide bargaining unit and was directed at BCL by virtue of its status in the multi-employer bargaining association, the NYSA. BCL's proposed move to Salem would deplete the number of longshore jobs available to ILA workers in the port of New York and divert them to non-union labor in Salem. This effect would directly hurt existing members of the bargaining unit, and the Container Agreement by prohibiting BCL's proposed move preserves work within the primary employment relationship. BCL's reliance on National Maritime Union thus is misplaced because the members of the bargaining unit here constitute the actual work force and directly benefit from the Containerization Agreement.
 
 
 19
 The district court also properly found that there was no material issue of fact as to whether BCL unequivocally intended to be bound by the Master Contract that NYSA negotiated on its behalf. We are not persuaded by BCL's argument that it was not a party to the Master Contract because it was not the direct employer of the longshoremen. Preliminarily, we note that BCL did not challenge the LIGC's findings that the Master Contract bound BCL. It was not until BCL filed an unfair labor practice charge with the NLRB that BCL raised this issue. Assuming that this argument is properly before us, we reject it. Contrary to BCL's assertion, our decision in ILA v. Delta S.S. Lines, Inc., 832 F.2d 759 (2d Cir. 1987), does not require us to determine the validity of the Containerization Agreement based on whether BCL was an employer within the common law meaning of the term. In Delta Steamship, we did not reach the Section 8(e) question because issues of fact existed regarding Delta's intention to be bound by the multi-employer collective bargaining agreement at issue. See id. at 763-764. Here, however, BCL unequivocally intended to be bound by the collective bargaining agreement and we find no reason to abandon the multi-employer analysis applicable to the industry-wide contract and consider instead common law employer issues.
 
 
 20
 We look to the employers' consent to determine whether different employers belong to the same bargaining unit. See NLRB v. New York Typographical Union, No. 6, 632 F.2d 171, 183 (2d Cir. 1980). "The Board has consistently held that the essential element warranting the establishment of multi-employer units is clear evidence that the employers unequivocally intend to be bound in collective bargaining by group rather than individual action." Id. (citations and quotations omitted). "[T]he presumption that a single employer bargaining unit is appropriate can be overcome only by 'clear evidence that the employers unequivocally intend to be bound in collective bargaining by group rather than by individual action.'" NLRB v. 1115 Nursing Home & Serv. Emp. Union, 44 F.3d 136, 138 (2d Cir. 1995) (per curiam), quoting New York Typographical Union, No. 6, 632 F.2d at 183. However, mere agreement to bargain as a group is insufficient; there must be actual bargaining on that basis. See 1115 Nursing Home & Serv. Emp. Union, 44 F.3d at 138. Here, BCL was a member of NYSA from 1979 until its formal resignation on June 20, 1996. By virtue of its membership in the association, BCL granted NYSA authority to negotiate a collective bargaining agreement with the ILA. Actual bargaining on a multi-employer basis took place while BCL was a member of NYSA. BCL was bound by the resulting agreements, including the 1996 Master Contract, which included the containerization provisions. Therefore, the district court correctly held that no issue of fact existed regarding BCL's intent to be bound by the multi-employer Master Contract. Because the Containerization Agreement within that contract was a valid work preservation clause directed at the primary employment relationship, the contract was legal and Judge Keenan correctly held that Section 8(e) does not prohibit confirmation and enforcement of the arbitration award.
 
 II. Remaining Contentions
 
 21
 We affirm the dismissal of the antitrust claims for substantially the reasons that the district court articulated. Likewise, we affirm the dismissal of the state law fraud claim. BCL alleged that NYSA knew that the collective bargaining agreement barred BCL's proposal to move to Salem but failed to so inform BCL at a July 1995 meeting, when BCL still would have had time to withdraw from the association and avoid having to adhere to future contracts. The district court acknowledged that there may have been issues of fact as to materiality, intent, and duty to disclose, but Judge Keenan dismissed the fraudulent concealment claim because BCL could not show reasonable reliance or causation. See Bermuda Container Line Ltd. v. ILA & NYSA, 1999 WL 64305, at *5. The district court found that regardless of what happened in July 1995, NYSA informed BCL by letter dated August 8, 1995, that BCL would be bound by the collective bargaining agreement unless it withdrew from the association prior to the commencement of negotiations. See id. On appeal, BCL argues that there were material factual issues as to why BCL did not respond to NYSA's August 1995 letter.
 
 
 22
 To state a claim for fraudulent concealment a plaintiff must show: (1) that the defendant failed to disclose material information that he had a duty to disclose, see Nasaba Corp. v. Harfred Realty Corp., 287 N.Y. 290, 295 (1942); "(2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." Banque Arabe et Internationale D'investissement v. Maryland Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995). Plaintiff's reliance must be "reasonable or justifiable." Id. at 156. We conclude that BCL as a matter of law could not have reasonably relied on NYSA's silence at the July 1995 meeting and therefore its fraudulent concealment claim fails. It is undisputed that NYSA notified BCL in August 1995 that its failure to withdraw from the association before November 1995 would result in BCL having to adhere to the collective bargaining agreement. BCL was free to withdraw from NYSA at any time. BCL's failure to withdraw from the association prior to the start of contract negotiations in November, not NYSA's silence, caused BCL to be bound by the collective bargaining agreement. Therefore, the district court properly dismissed the fraudulent concealment claims.
 
 CONCLUSION
 
 23
 We have considered all of appellant's contentions and find them to be without merit. The judgment of the district court is affirmed.
 
 
 
 Notes:
 
 
 [1]
 Containerization technology revolutionized maritime cargo handling techniques. See CTI-Container Leasing Corp. v. Oceanic Operations Corp., 682 F.2d 377, 380 (2d Cir. 1982). Carriers previously shipped goods in pallets, which needed to be broken down when the ship reached port and repackaged for ground transport. Containers enable ships to carry numerous smaller packages in portable containers instead of shipping break-bulk cargo and eliminates the process of unloading and repackaging goods. As the Supreme Court explained, "containerization permits the time-consuming work of stowage and unstowage to be performed on land in the absence of the vessel. The use of containerized ships has reduced the costly time the vessel must be in port and the amount of manpower required to get the cargo onto the vessel." Id. (quoting Northeast Marine Terminal Co. v. Caputo, 432 U.S 249, 270 (1977)). In an effort to stem the resulting loss of jobs at waterfront facilities, unions convinced employers to agree to use only union employees for longshore work.
 
 
 [2]
 The FAA provides that a court may vacate an award:
 (1) Where the award was procured by corruption, fraud or undue means. (2) Where there was evident partiality or corruption in the arbitrators. . . . (3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced. (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. (5) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.
 9 U.S.C. § 10.
 
 
 [3]
 The term "ro-ro" is an acronym that refers to the "roll-on-roll-off" method of moving cargo from ground transport vehicles to a ship and vice-versa. See Rupp v. International Terminal Operating Co., 479 F.2d 674, 675 (2d Cir. 1973). "Ro-ro" is contrasted with the "lo-lo"or "lift-on-lift-off" method in which a crane lifts the cargo container on and off the ship. See Trailer Marine Transp. Corp. v. Rivera Vazquez, 977 F.2d 1, 3 (1st Cir. 1992).