**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION NO. 501, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 75–1160.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 5, 1977.
Decided Nov. 11, 1977.

---

Ralph P. Katz, New York City, with whom Martin R. Ganzglass, Washington, D. C., was on the brief, for petitioner.

Jay E. Shanklin, Atty., N. L. R. B., Washington, D. C., with whom John S. Irving, Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., were on the brief for respondent.

Before BAZELON, Chief Judge, and TAMM and WILKEY, Circuit Judges.

Opinion for the Court filed by BAZELON, Chief Judge.

BAZELON, Chief Judge:

In this case we are asked to decide whether coercion by the International Brotherhood of Electrical Workers, Local Union No. 501, AFL–CIO (Local 501) against two subcontractors, Peter M. Santella, Inc. (Santella) and Rice Electrical Contracting Co. (Rice), violated § 8(b)(4)(ii)(B) of the National Labor Relations Act.[1] To determine whether this coer-

---

1. Section 8(b) states:
   It shall be an unfair labor practice for a labor organization or its agents— ·

   *   *   *   *   *   *

   (4)(ii) to threaten, coerce, or restrain any person engaged in commerce or in any indus-

cion constituted permissible primary activity or illegal secondary activity, we must interpret and apply the "right of control" doctrine as recently set out by the Supreme Court in *NLRB v. Enterprise Association*, 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977).

I

In 1973, Atlas Construction Company (Atlas) contracted to act as general contractor for two separate building projects in Stamford, Connecticut—the construction of a new plant for the Stamford Pressed Beef Company (the Stamford project) and the construction of an office building for Hilti, Inc. (the Hilti project). In October 1973, Atlas awarded the permanent electrical work on the Hilti project to Rice, and in January 1974, it subcontracted with Santella to install the permanent wiring and fixtures on the Stamford project. In both projects Atlas retained control over the operation of the temporary power. (Joint Appendix (J.A.) at 188, 230.)

Both Santella and Rice were members of the Westchester-Fairfield chapter of the National Electrical Contractors Association (NECA), a multi-employer bargaining association, and both were bound by the terms and conditions of the collective bargaining agreement between NECA and Local 501. J.A. at 184–85. This agreement contained a work preservation clause that Local 501 interpreted as affirming its right to operate the temporary power on construction sites.[2]

Local 501 also retained a limited right to strike under the agreement.[3] The agreement provided for resolution of labor disputes through their submission to a joint Labor-Management Committee.[4]

In early March 1974, Santella began work on the Stamford project. At that time, as during the previous eleven months of construction on the project, Atlas employees were operating the temporary power. On March 27, Santella was notified by its foreman on the job that its men "were going to be withdrawn from the job." J.A. at 83, 90. Peter M. Santella, President of the company, thereupon telephoned Fred Wright, chief business agent of Local 501, who told Santella that he was violating his agreement with the union, which required union employees "to maintain and operate" the temporary power. J.A. at 84. As a result, Santella ordered its employees to cease work on the Stamford job and assigned them to a different job site. J.A. at 14–15, 245.

On April 1, Atlas sent Santella a telegram threatening to hire another electrical subcontractor unless Santella resumed work within 72 hours. Santella then consulted a union official who suggested that Santella consult the union's attorney. The union attorney suggested that Santella notify Atlas that its union employees were not working on the job because they were not being given the work of operating the temporary power. Also at the suggestion of the attorney, Santella's letter to Atlas urged that

try affecting commerce, where in either case an object thereof is—

    \*      \*      \*      \*      \*      \*

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing . . . . .

61 Stat. 141, as amended, 73 Stat. 542, 29 U.S.C. § 158(b)(4)(B).

**2.** The agreement stated that "Where wiring systems and equipment are required for lighting, power, heat, etc., during the period of construction of a building, these systems and equipment shall be installed, maintained and operated by electrical workers." J.A. at 171.

**3.** "Members of the Union shall not work for any employers except those who comply with the working rules later stated in this agreement." J.A. at 158.

**4.** *See* J.A. at 157.

"we"—referring to Atlas, Santella, and the union—meet on the matter. J.A. at 86, 91, 207.

On April 10, Atlas brought unfair labor practice charges against Local 501. On April 11, Local 501 and Santella met with Atlas at the jobsite. J.A. at 39. Union representative Ed Troy stated that Local 501 wanted a union electrician to operate the temporary power. J.A. at 41. Troy talked principally with Atlas, J.A. at 39, and asked Atlas to change its subcontract with Santella so as to grant it the authority to operate the temporary power. J.A. at 65. At one point Troy stated to Atlas and Santella that, "This is a matter between you businessmen, and certainly you can find a way to make an adjustment to this problem." J.A. at 42. He told Atlas that Santella's union employees "would not return to the [Atlas] job until such time as Local 501 members were permitted to operate the [temporary power] switch." J.A. at 42–43.

Atlas continued to refuse Santella's employees permission to operate the temporary power. On April 23, however, Santella and Local 501 took their dispute to the Joint Labor-Management Committee of NECA and a compromise was effected. The Committee unanimously held that Santella had breached the work preservation clause of the collective bargaining agreement, and it required Santella to employ a union member for the extra time required to operate the temporary power.[5] Atlas would not be charged. Santella's employees thereafter returned to work at the job site.

Events at the Hilti job were analogous to those at Stamford. Rice began work in mid-March 1974. On April 5, Ed Troy informed Rice that it was in violation of its collective bargaining agreement with Local 501 because a union member was not operating the temporary power. He told Rice that the union "may remove the 501 employees from your employ" if the violation

continued. J.A. at 74. Troy also asked Atlas to change its subcontract with Rice. J.A. at 65. In response to this pressure Rice discontinued work on the Hilti job, stating that it would return when Local 501 members were permitted to operate the temporary power. On April 15, Atlas brought unfair labor practice charges against Local 501. On April 17, Rice returned to work under "a purely tentative arrangement" that left the basic dispute unresolved. 216 N.L.R.B. at 420. Atlas informed Rice that "as a result of coercion employed by your firm and Local 501," J.A. at 241, it would permit a Rice employee to operate the temporary power until 3:30.[6]

The regional director of the NLRB sought an injunction pursuant to § 10(*l*) of the National Labor Relations Act, 29 U.S.C. § 160(*l*), pending the Board's consideration of the unfair labor practice charges against Local 501. The injunction was denied, *Danielson v. IBEW, Local 501,* Civil No. N–74–89 (D.Conn.1974), *aff'd,* 509 F.2d 1371 (2d Cir. 1975).

On June 27, 1974, an Administrative Law Judge (ALJ) found that Local 501 was not guilty of unfair labor practices and recommended that the complaints be dismissed. On January 31, the Board overturned the ALJ, concluding that in both cases Local 501 had "violated Section 8(b)(4)(ii)(B) of the Act." 216 N.L.R.B. 417, 418 (1975). The Board issued the usual "cease and desist" order. The union petitions pursuant to § 10(f) of the Act to have the Board's order set aside. The Board cross-applies under § 10(e) of the Act for the enforcement of its order.

## II

There is no doubt in this case that Local 501 exerted coercion within the meaning of § 8(b)(4). The issue is whether "an object" of this coercion was to cause the cease-doing-business consequences prohibited by

---

5. The temporary power at construction sites is generally shut off at 4:30 p. m. However, the electricians' day ends at 3:30 p. m. Santella was thus required to pay an electrician over-

time to remain on the job until the temporary power was shut off at 4:30.

6. *See* note 5 *supra.*

§ 8(b)(4)(ii)(B). In *NLRB v. Enterprise Association,* 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977), the Supreme Court stated that an important factor in the resolution of this issue is whether the union is coercing "an employer in order to obtain work that the employer has no power to assign . . ." *Id.* at 521, 97 S.Ct. at 900. If a union pressures an employer, even one with which it has a valid collective bargaining agreement, to obtain work over which the employer has no "right of control," there is at least "strong evidence," *id.* at 527 n. 15, 97 S.Ct. 891, that the union's actions are not "addressed to the labor relations of the contracting employer *vis-à-vis* his own employees," *National Woodworking Manufacturers Assn. v. NLRB,* 386 U.S. 612, 645, 87 S.Ct. 1250, 1268, 18 L.Ed.2d 357 (1967), but are instead "tactically calculated to satisfy union objectives elsewhere," *id.* at 644, 87 S.Ct. at 1268, and are thus prohibited secondary activity.

■ There is no question in this case that neither Santella nor Rice had a "right of control" over the operation of the temporary power. That right was specifically reserved in their contracts to Atlas, who refused to concede it even in the face of work stoppages. Using the reasoning of *Enterprise Association,* it would thus appear that Local 501's objective was to force the neutral employers Rice and Santella to cease doing business with Atlas, the employer with whom the union's actual dispute existed. This objective, in which Local 501 was successful, clearly constitutes illegal secondary activity. That Local 501 may also have been seeking to enforce its collective bargaining agreement and to convince Rice and Santella not to bid on jobs in the future without control of the temporary power does not alter the fact that the union also sought to obtain the work from Atlas through impermissible means. *See* 429 U.S. at 530–31, 97 S.Ct. 891.

The "right of control" test, however, is not "mechanical." 429 U.S. at 521 n. 8, 97 S.Ct. 891. It must be determined if the coerced employer is "unoffending." As the Board has stated, "we have studied and shall continue to study not only the situation the pressured employer finds himself in but also how he came to be in that situation. And if we find that the employer is not truly an 'unoffending employer' who merits the Act's protections, we shall find no violation in a union's pressures . . ." *Local Union No. 438, United Association of Journeymen and Apprentices (George Koch Sons, Inc.),* 201 N.L.R.B. 59, 64, *enforced, George Koch Sons, Inc. v. NLRB,* 490 F.2d 323 (4th Cir. 1973).

The ALJ below found that Santella and Rice were not "unoffending employers," and Local 501 now presses this claim. The ALJ stated:

The record here demonstrates that Atlas had full authority to grant all or part of the electrical work at both sites and Santella and Rice had full bargaining power with respect to that work. Under the circumstances it is plain that Santella and Rice, in effect, voluntarily surrendered their right to control when they negotiated away the work which they had earlier agreed in their collective-bargaining agreement to preserve for their employees. . . . Here, Santella and Rice cannot be regarded as "unoffending employers" who merit the Act's protections . . . . Santella and Rice had the potential for control. By their voluntary action they forfeited that potential.

216 N.L.R.B. at 421–22.

The ALJ relied in part on *George Koch Sons, Inc. v. NLRB,* 490 F.2d 323 (4th Cir. 1973), in which the Fourth Circuit stated that "[c]ertainly where the employer was initially in a position to accede to potential union demands through the negotiating stages of the contract, then he should not later be deemed a neutral if he intentionally forfeited his potential for control." *Id.* at 328. The Fourth Circuit was concerned that a subcontractor and general contractor "could fake the appearance of a secondary boycott by a collusive contract providing that the work ordinarily belonging to [the subcontractor's] employees should be performed elsewhere." *Id.*

The Board, however, rejected this approach to defining an "unoffending employer." It characterized the ALJ's decision as based merely "on the fact that Santella and Rice, in his view, simply did not try hard enough to secure the operation of the temporary power supply from Atlas at the negotiation stage of the subcontracts involved." 216 N.L.R.B. at 418. The Board noted that attempting "to define the parameters of 'unoffending employer' based solely on an expenditure of effort on the part of the employer seeking the Act's protection seems realistically futile, as well as administratively unmanageable." *Id.* The Board concluded that the ALJ had misunderstood the "unoffending employer" doctrine:

> In the past, we have indicated that an employer could not be considered "unoffending," and therefore neutral, if it actively and knowingly contracted away its control by *initiating* the very restrictions which ultimately gave rise to the union's demands, *Painters District Council No. 20, Brotherhood of Painters, Decorators and Paperhangers of America, AFL–CIO (Uni-Coat Spray Painting, Inc.),* 185 NLRB 930, 932 (1970), or if the coerced employer was, in fact, given control of the work at issue but, *of its own volition,* withheld the work from the union, *Pipe Fitters Local No. 120, United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL–CIO (Mechanical Contractors' Association of Cleveland, Inc.),* 168 NLRB 991, 992 (1967). In both cases, the coerced employer's forfeiture of neutral status was based on some *affirmative* conduct which the employer could reasonably conclude would conflict with his collective-bargaining obligations, coupled with the *absence* of any demand for such conduct by an independent third party such as a general contractor or project owner.

*Id.* at 417.

■ Although we are apprehensive that the Board's expansive definition of an "unoffending employer" may virtually invite the collusion feared by the Fourth Circuit, we affirm the Board's determination for two reasons. First, we concur in the Board's judgment that scrutiny of the good faith of the contract negotiation process would lead to a legal and administrative morass. "Here, as in other cases, we must recognize the Board's special function of applying the general provisions of the Act to the complexities of industrial life, *Republic Aviation Corp. v. Labor Board,* 324 U.S. 793, 798, [65 S.Ct. 982, 985, 89 L.Ed. 1372,] . . . and of '[appraising] carefully the interests of both sides of any labor-management controversy in the diverse circumstances of particular cases' from its special understanding of 'the actualities of industrial relations.' *[National] Labor [Relations] Board v. United Steelworkers,* 357 U.S. 357, at 362–363 [78 S.Ct. 1268, 2 L.Ed.2d 1383]," *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963).

Second, the Board's expansive definition of "unoffending employer" finds substantial support in *Enterprise Association.* In that case the coerced subcontractor (Hudik) bid on a contract it knew in advance would be in violation of its collective bargaining agreement,[7] yet the Supreme Court upheld the Board's conclusion that the employer was neutral and unoffending. This would appear to foreclose scrutiny of the good faith of the contract negotiation process. Moreover, *Enterprise Association* is consistent with the affirmative standard set out in this case: Hudik did not *initiate the restrictions* in the contract that violated its collective bargaining agreement and the general contractor affirmatively demanded that it enter into these restrictions.

■ Using the standards for an "unoffending employer" set out by the Board below, we find that both Santella and Rice were unoffending. Neither subcontractor sought to have the operation of the temporary power withheld from its employees,

---

7. *See Enterprise Association v. NLRB,* 172 U.S. App.D.C. 225, 229–230, 521 F.2d 885, 889–90 (1975); *Enterprise Association of Steam Pipefitters,* 204 N.L.R.B. 760, 762 (1973).

**354**

and in both cases Atlas affirmatively demanded these restrictions.

### III

█ Local 501 raises two additional objections to the Board's order, both of which are without merit. First, the union argues that the existence of the arbitration award distinguishes this case from other "right of control" decisions. In this, Local 501 is incorrect. *See Local Union No. 438, United Association of Journeymen and Apprentices (George Koch Sons, Inc.)*, 201 N.L.R.B. 59, 63 n. 25, *enforced, George Koch Sons, Inc. v. NLRB*, 490 F.2d 323 (4th Cir. 1973). The arbitration award at most establishes that Santella was in fact in violation of its collective bargaining agreement with Local 501, a consideration the Supreme Court has specifically deemed irrelevant to the determination of whether activity is prohibited by § 8(b)(4)(ii)(B). 429 U.S. at 514–21, 97 S.Ct. 891.

█ Second, Local 501 argues that its acceptance of the arbitration award and its participation in the "tentative agreement" at the Hilti job demonstrates that it was seeking only that over which Santella and Rice had control. We believe, on the contrary, that these facts indicate only that Local 501 may have altered its objectives. The record is clear that at least initially the union coerced Rice and Santella in order to obtain the right to operate the temporary power, a right over which neither of the subcontractors had control. It was at this point that Atlas filed its unfair labor practice charges. If Local 501 later receded from these prohibited objectives, this does not purge it from its prior illegal conduct. *See Pipe Fitters Local No. 120 (The Spohn Corp.)*, 168 N.L.R.B. 991 (1967).

We therefore hold that the order of the National Labor Relations Board should be enforced.

*So ordered.*