# United States Court of Appeals

## For the First Circuit

No. 99-1697

UNITED STATES,

Appellee,

v.

RONALD WOODRUM a/k/a DAVID WILSON,

Defendant, Appellant.

————

Before

Torruella, <u>Chief Judge</u>

Selya, Boudin, Stahl, Lynch and Lipez, <u>Circuit Judges</u>.

————

ORDER OF COURT

Entered: April 6, 2000

The panel of judges that rendered the decision in this case having voted to deny the petition for rehearing and the suggestion for the holding of a rehearing en banc having been carefully considered by the judges of this Court in regular active service and a majority of said judges not having voted to order that the appeal be heard or

reheard by the Court en banc, the Court being equally divided,

It is ordered that the petition for rehearing en banc be denied.

Dissent attached. (Lynch, Circuit Judge, joined by Torruella, Chief Judge and by Lipez, Circuit Judge as to Parts II and III).

By the Court:

Phoebe Morse, Clerk.

**LYNCH, Circuit Judge, with whom TORRUELLA, Chief Judge, joins, and with whom LIPEZ, Circuit Judge, joins as to Parts II and III, dissenting**. I respectfully dissent from the denial of defendant Woodrum's petition for rehearing en banc for two reasons: the case has great constitutional and societal significance, and so meets the requirements of Rule 35(a), Fed. R. App. P., and there is reason to doubt that the opinion is correctly decided.

**I.**

This case is an important one, not just for the development of Fourth Amendment law, but also for the quality of life in urban areas and the protection of individual rights. These factors alone argue for rehearing en banc. The panel decision permits police, without any particular justification, to stop and look over taxicabs occupied with passengers. This is a seizure under the Constitution, as the government concedes. See Townes v. City of New York, 176 F.3d 138, 144 (2d Cir. 1999). Normally, the government would need probable cause, or at least reasonable suspicion, of a crime to make such a stop. If, after the stop, the police see anything that looks suspicious, they may then get the passenger out of the cab. If the

-3-

police see that the passenger has something illicit (here a gun), the passenger may be arrested and the evidence seized.  The latter two "if" propositions are well established under Fourth Amendment law.  But the opening premise -- that the police may randomly stop a cab with a passenger -- is a new rule and is the crux of the matter here.

According to the panel, a voluntary, police-sponsored program (called the Taxi Inspection Program for Safety or TIPS) justifies this new rule.  By its participation in TIPS, the cab company consents to the police stopping the cab, the company's consent can be attributed to the cab driver, and from there, consent can be imputed to the passenger because of his decision to enter the cab.  See United States v. Woodrum, 202 F.3d 1, 9-11 (1st Cir. 2000).  Thus, effectively, the cab company is permitted to waive the Fourth Amendment rights of citizens to be free from seizure.

There are important interests on both sides of this case. Begun in 1991 as "Operation Taxi," and modified in 1996 to become TIPS,[1] the program is a well-intentioned response to a rash of attacks and shootings, some fatal, of cab drivers by passengers, particularly in minority urban areas.  Cab driving -- in Boston, as elsewhere -- is a

---

[1]    The program was revised after a number of Massachusetts trial courts granted motions to suppress items seized in searches that resulted from "Operation Taxi" stops.  See Commonwealth v. Carle, Nos. 94-11050, 94-11049, 1995 WL 737537, at *3 (Mass. Super. Ct. Oct. 31, 1995); Commonwealth v. Bland, No. 94-10127, 1994 WL 879833, at *3-*4 (Mass. Super. Ct. Aug. 23, 1994); Commonwealth v. Cosme, No. 94-10014, 1994 WL 879664, at *4 (Mass. Super. Ct. May 9, 1994).

notoriously dangerous occupation and the safety of drivers has been, and continues to be, at risk. Efforts to protect the safety of cab drivers are certainly warranted. And one of the collateral benefits of the TIPS program may be to encourage cab drivers to provide service to certain neighborhoods, neighborhoods they would otherwise shy away from. Given the realities of urban life, the panel's decision affirming the validity of consent to seizure through the TIPS program may mean that the TIPS program will be emulated in other cities and in other sectors of the economy.[2]

But there are also interests on the other side, particularly Fourth Amendment interests. The very purpose of many constitutional guarantees, particularly those contained in the Fourth Amendment, is to fetter the exercise of discretion by the police. Indeed, it may be unhealthy for the police themselves to have such unfettered discretion, as such discretion could easily lead to dishonest and sloppy police work. Further, unfettered police discretion has at times led to racial bias in law enforcement, whether intended or not. Commentators and cases have noted that being "stopped for being black" is a frequent

---

[2] New York City implemented a similar program, now called TRIP (Taxi and Livery Robbery Inspection Program), in 1993. Recently, the New York Court of Appeals found seizures conducted under the program constitutionally invalid, thereby tainting evidence acquired as a result. See In re Muhammad F., 722 N.E.2d 45, 51-52 (N.Y. 1999), petition for cert. filed sub nom. New York v. Muhammad F., 68 U.S.L.W. 3577 (U.S. Mar. 14, 2000) (No. 99-1443); see also United States v. Santiago, 950 F. Supp. 590, 596-98 (S.D.N.Y. 1996).

occurrence.  See, e.g., Randall Kennedy, Race, Crime, and the Law 138-63 (1997).  A decade ago, the Massachusetts Attorney General issued a report assailing the Boston Police Department for the practice of subjecting black citizens to unconstitutional searches and seizures.  See Report of the Attorney General's Civil Rights Division on Boston Police Department Practices (Dec. 18, 1990), cited in David Cole, No Equal Justice 25-26 & 57 n.30 (1999).  And in 1992, the Supreme Judicial Court of Massachusetts held unconstitutional, under the Fourth Amendment, another policy of the Boston Police, under which the police stopped and searched known or suspected gang members and their associates on sight.[3]  See Commonwealth v. Phillips, 595 N.E.2d 310, 314-16 (Mass. 1992).

The police already have considerable discretion to stop persons.  A police officer can stop a person based simply on reasonable suspicion, see Terry v. Ohio, 392 U.S. 1, 30 (1968), and in determining whether they have reasonable suspicion, the police may consider the

---

[3]     As Judge Newman has said,

> [t]he risk inherent in such a practice is that some police officers will use the pretext of traffic violations or other minor infractions to harass members of groups identified by factors that are totally impermissible as a basis for law enforcement activity -- factors such as race or ethnic origin, or simply appearances that some police officers do not like, such as young men with long hair, heavy jewelry, and flashy clothing.

United States v. Scopo, 19 F.3d 777, 785 (2d Cir. 1994) (Newman, C.J., concurring).

fact that a person turns and runs, see Illinois v. Wardlow, 120 S. Ct. 673, 676 (2000).  In addition, traffic stops, in practice, may be used as a pretext to investigate other crimes because courts will not usually inquire into the actual motives of the police.  See Whren v. United States, 517 U.S. 806, 813 (1996).  Although police may not make stops based on race, it is difficult to show such motivation, and even obtaining discovery about racial practices is difficult.  See United States v. Armstrong, 517 U.S. 456, 468-70 (1996).  When one sector of the community feels the brunt of discretionary police action more than others, that sector may be less likely to accept that the purpose of the law is to protect them.  The extension of police discretion that results from the panel decision and its societal consequences make this case worthy of a rehearing en banc.

## II.

The case should be reheard by the en banc court because a novel constitutional issue is involved.  It is far from clear that the panel's decision (even as amended) is correct.  The case turns on the following question: Does the participation of the cab company in a voluntary program, which gives the company's consent to the police stopping a company's cab, amount to a consent by the passenger of the cab to being stopped, seized, and visually searched when there is neither reasonable suspicion nor probable cause to believe there is any criminal activity?

This question and the panel's answer raise a number of concerns. To begin with, the opinion applies third-party consent principles derived from the search context to the seizure context. This is novel. Woodrum made no individual decision to submit to police authority. Rather, that decision was made for him by the taxicab owner, and imputedly, the driver.[4]

The panel opinion correctly points out that "when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it . . . may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171 (1974). Common authority "rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Id. at 171 n.7.

But there is no authority cited for the application of third-party consent rules to the seizure context. Indeed, the only authority

_____

4 Even if the cab company could consent to stops and seizures of its cabs when the cab had only the driver in it, it does not follow that the driver has any authority to consent to the seizure of the passenger. It would be a fiction to characterize the consent given by the driver and the passenger as "direct."

-8-

cited by the panel for the proposition that "[s]eizures by consent generally are considered reasonable" is Florida v. Jimeno, 500 U.S. 248, 250-51 (1991). See Woodrum, 202 F.3d at 11. But that case is a search case, not a seizure case; it is a first-party consent case, not a third-party consent case; and it is a search of an automobile case, not a seizure of a person case. See Jimeno, 500 U.S. at 249. Indeed, the panel opinion acknowledges that third-party consent has only been applied to searches, not seizures. See Woodrum, 202 F.3d at 10-11.

Critical to the panel's decision is the analogy it draws between the shared control over the taxicab and the shared control over a living space. The analogy is weak. In the latter instance, one co-habitant's consent is imputed to other co-habitants because persons living together reasonably understand that their housemates may invite outsiders (including the police) to enter the premises and look around "common areas."

Although the passenger, in entering a taxicab, certainly relinquishes some control over the technical driving decisions of the taxicab driver, the relationship is not like the sharing expected between housemates. When a passenger hires a taxicab, the expectation is that the passenger assumes control over all the important decisions, including the vehicle's travel route (should the passenger choose to specify) and its ultimate destiny. It is doubtful that a passenger, through nothing more than this relationship with the taxicab driver,

consents to the unfettered discretion of the police to stop the taxicab in order to make sure that he himself is not a dangerous criminal.

Further, the relevant seizure, here, is not of the taxicab, and so the cab driver and passenger's overlapping authority over the vehicle is beside the point. For the purposes of third-party consent in this seizure, the relevant object over which the cab driver and passenger would need to have common authority is the taxicab passenger. But the cab driver does not, cannot, have common authority over the passenger's person; simply, and obviously, a person cannot give third-party consent to the search or seizure of another person.

The opinion also discounts the privacy interests of someone who hails a cab. There is in fact a reasonable expectation of privacy by the passenger in a cab. Sometimes people take cabs precisely because cabs give a greater degree of privacy than public mass transit or even than walking along a sidewalk. If a cab driver were to stop the cab against the will of the passenger, the fare would normally end; the passenger's expectation is that the cab will not normally stop until it reaches the destination dictated by the passenger; and the passenger expects he will enjoy the privacy of the passenger compartment.

The cab passenger is not like someone who visits a prison and so "consents" to certain special prison procedures that are driven by security needs. Cf. United States v. Sihler, 562 F.2d 349, 350-51 (5th

-10-

Cir. 1977). The better analogy may be to a hotel room, which, like a cab, is rented for sole occupancy for a period of time. We would not say that the owner of a hotel could consent to the search of hotel rooms occupied by guests through the owner's voluntary participation in a program that authorized police to enter the rooms at their discretion to protect the cleaning staff or to prevent theft of hotel property.[5] In Stoner v. California, 376 U.S. 483 (1964), the Supreme Court held that the Fourth Amendment protected a hotel guest from use of evidence seized under a "consent" to search his hotel room given by the desk clerk. See id. at 490.

Further, the purported "consent" here is of an odd sort -- it is not a consent to specific police action in a specific factual setting, as is usually the situation in consent to search cases. In

_____

[5] It is a weak argument that a passenger who hails a cab, perhaps the only cab in sight and perhaps after dark, has voluntarily consented to being seized because there is a small decal on the cab indicating its participation in the TIPS program. In this case, Woodrum apparently hailed the cab in the dark between midnight and 1 a.m. on a January night in Boston. In Massachusetts, a cab is a public accommodation and a common carrier, and citizens have every reason to think that their constitutional rights will be protected, not waived, when they take a cab. See Mass. Gen. Laws ch. 272, § 92A (public accommodation); Hathaway v. Checker Taxi Co., 73 N.E.2d 603, 606-07 (Mass. 1947) (taxicab drivers, as common carriers for hire, owe their passengers the "highest degree of care"). As the Seventh Circuit has said, "Courts confronted with claims of implied consent have been reluctant to uphold a warrantless search based simply on actions taken in the light of a posted notice." McGann v. Northeast Reg'l Commuter R.R. Corp., 8 F.3d 1174, 1180 (7th Cir. 1993). In any event, the standards for a voluntary waiver of a constitutional right are not met by hailing a cab and then getting in one that bears a TIPS decal.

those situations, the voluntariness of the consent is determined from the circumstances. See Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973). Here, by contrast, the anticipatory consent to seize given by the cab company is open-ended: the seizure may be at any time and under any circumstances. Cf. United States v. Patrick, 959 F.2d 991, 996 (D.C. Cir. 1992). Further, there is no mechanism for the cab company, the driver, or the passenger to revoke the anticipatorily given consent in a given situation. Indeed, the passenger here has no option to terminate the seizure and so this situation is unlike the search in Florida v. Bostick, 501 U.S. 429, 436-37 (1991). Thus, the panel approves a new and questionable Fourth Amendment doctrine of irrevocable anticipatory consent to seizure (and third-party consent at that).

In some respects, this case is more akin to random stops of motorists on public highways by the police that are not supported by probable cause or reasonable suspicion. In Delaware v. Prouse, 440 U.S. 648 (1979), the Supreme Court held that such stops were unconstitutional. See id. at 663. In Prouse, the Court distinguished between impermissible "sporadic and random stops of individual vehicles making their way through city traffic" and permissible "roadblocks where all vehicles are brought to a halt or a near halt." Id. at 657. This case is unlike sobriety checkpoints where all cars and all drivers are stopped and inspected for signs of intoxication, a practice that

-12-

was upheld in Michigan Department of State Police v. Sitz, 496 U.S. 444, 447 (1990). Indeed, the government has made no argument here that the stop can be justified under Sitz. The government's justification for the stop turns entirely on the issue of consent. As in Prouse, the police here had virtually unfettered discretion and the ability to engage in selective enforcement.

"[T]he Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." Brown v. Texas, 443 U.S. 47, 51 (1979). The TIPS program is not a plan "embodying explicit, neutral limitations on the conduct of individual officers." There is a purported limit in the police manual for the TIPS program that the "[s]tops should be conducted when and wherever necessary, particularly during the evening and early morning hours. Attention will be given to isolated and high crime areas." These instructions are so broad that they most likely will not act as limits at all.[6] In fact, the legend on the decal may be the most accurate

_____

[6]     A Massachusetts Superior Court judge held that almost identical instructions, in a predecessor program to TIPS, did not act to limit "the arbitrary and unbridled discretion of the police officers." Commonwealth v. Cosme, No. 9410014, 1994 WL 879664, at *4 (Mass. Super. Ct. May 9, 1994).

description: "This vehicle may be stopped . . . at any time . . . ." If an open-ended anticipatory third-party consent to the seizure of a passenger in a cab is doubtful, and if the random stopping of cabs absent such consent is forbidden, then the result reached here is questionable.

### III.

This is a difficult case and the panel opinion is a lucid articulation of an alternative analysis. But, for the reasons stated, I respectfully dissent from the denial of the petition for rehearing en banc.

———————————

[cc: Mr. Shapiro, Mr. Wortman, Mr. Richardson, Mr. Hamilton & Ms Chaitowitz]