Local 917 of the Int'l Bhd. of Teamsters v. NLRB

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2008

(Argued: December 3, 2008        Decided: August 11, 2009)

Docket No. 07-2424-ag(L), 07-2696-ag(XAP)

- - - - - - - - - - - - - - - - - - - -X

LOCAL 917, INTERNATIONAL BROTHERHOOD
OF TEAMSTERS,
          Petitioner-Cross-Respondent,


                    -v.-                     07-2424-ag(L)
                                             07-2696-ag(XAP)


NATIONAL LABOR RELATIONS BOARD,
          Respondent-Cross-Petitioner.[*]


- - - - - - - - - - - - - - - - - - - -X


Before:        JACOBS, Chief Judge, McLAUGHLIN, and PARKER,
               Circuit Judges.


     This petition for review of a Supplemental Decision and

Order issued by a divided National Labor Relations Board

---

     [*]  The Clerk of Court is directed to amend the official
caption to conform to the list of parties above.

("NLRB") arises from a contractually permitted, unilateral change in the delivery terms under an exclusive distributorship agreement, as a result of which the employer's drivers lost work. The drivers' union (the "Union") now petitions for review of the NLRB ruling that its effort to enforce the work preservation clause amounted to a boycott in violation of Section 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e) ("Section 8(e)"). The Union challenges the finding that it violated § 8(e) and the imposition of attorneys' fees. The NLRB cross-petitions for enforcement.

We conclude that the Union violated Section 8(e), but we reverse the award of attorneys' fees.

GENE M. J. SZUFLITA, Belson & Szuflita, Brooklyn, New York, for Petitioner-Cross-Respondent.

JILL A. GRIFFIN, Supervisory Attorney, Amy H. Ginn, Attorney, National Labor Relations Board, Washington, D.C., for Respondent-Cross-Petitioner.

ALLEN B. ROBERTS, Donald S. Kruger, Epstein Becker & Green, P.C., New York, New York, for Intervenor Empire Merchants, LLC.

DENNIS JACOBS, Chief Judge:

This petition for review of a Supplemental Decision and Order issued by a divided National Labor Relations Board ("NLRB") arises from an exclusive distributorship agreement that the employer, Peerless Importers Inc. ("Peerless"), entered into with Diageo North America, Inc. ("Diageo"), a supplier of wines and spirits. Six months after the agreement went into effect, Diageo altered its sales terms to include delivery in the price of goods. As a result, Peerless's drivers lost work, and Petitioner Local 917 of the International Brotherhood of Teamsters (the "Union") sought to enforce the work preservation clause of the collective bargaining agreement between Peerless and the Union.

A divided NLRB concluded that the Union's effort to enforce the work preservation clause amounted to a boycott in violation of Section 8(e) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(e) ("Section 8(e)"). The Union now petitions for review of that decision, challenging the finding that it violated Section 8(e) and the imposition of attorneys' fees. The NLRB cross-petitions for enforcement.

We conclude that the Union violated the NLRA, but we reverse the award of attorney's fees.

I

Peerless distributes alcoholic beverages wholesale to retail liquor stores, hotels, and restaurants in the New York metropolitan area. For a dozen years, a collective bargaining agreement provided that the movement of freight to and from Peerless's warehouse in Greenpoint, Brooklyn, would be performed exclusively by the Union's drivers (subject to inapplicable exceptions).

On July 25, 2002, Peerless entered into a "Distribution Agreement" with Diageo by which Peerless became the exclusive distributor of Diageo products in the New York City area, including Smirnoff Vodka, Cuervo Tequila, Captain Morgan Rum, Goldschlager, Bailey's Irish Cream, Seagram's Canadian Whiskey, and a host of other brand-name spirits. The contract did not expressly allocate responsibility for the delivery of freight; according to the President of Peerless Imports, the issue of delivery was not discussed during contract negotiations. The contract did, however, allow Diageo to fix the sales terms:

4

> Prices and the terms and conditions of sale ("Sales Terms") shall be in accordance with Diageo's then in effect Sales Terms as may be modified from time to time by Diageo *without the consent of [Peerless]* . . . .

§ 4(A)(i) (emphasis added). Diageo thus had unilateral power to change the sales terms. In common understanding, the phrase "sales terms" references a bundle of arrangements and provisions, including (among other things) price, quantity, and the means by which the product is delivered. See, e.g., Dictionary of International Business Terms 482 (3d ed. 2004) (defining sales terms generally as "delivery and payment terms in a sales agreement"); see also 17A Am. Jur. 2d Contracts § 190 (2004) (material terms can include "subject matter, price, payment terms, quantity, duration, compensation, and the dates of delivery and production").

The Diageo agreement became effective in October 2002. For the next six months, Peerless's Union drivers continued to pick up and deliver all freight, including Diageo's product. In March 2003, Diageo announced a new national pricing plan called "Delivered Pricing." Diageo representatives scheduled a meeting with officers of Peerless, at which Diageo provided an "operational preview" of the new national pricing plan. Under the new plan--which

Diageo was in the process of rolling out to all of its distributors across the nation--the price of goods would increase, but the new price would include the price of delivery to the distributor's warehouse. The Delivered Pricing plan effectively displaced the Peerless drivers (although Peerless's drivers would still deliver products from the warehouse and pick up from other suppliers, and might still make pick-ups from Diageo when Diageo could not make the delivery). The Union was not notified in advance.

In November 2003, soon after the Delivered Pricing plan became effective, a Union grievance charged Peerless with breach of the collective bargaining agreement. Peerless did not respond to the grievance, and the Union filed a demand for arbitration.

The Arbitrator held a hearing on June 28, 2004, and, on September 28, 2004, ruled that Peerless had violated the collective bargaining agreement "by permitting merchandise from Diageo . . . to be delivered to the Company's warehouse by non-bargaining unit personnel." The Arbitrator retained jurisdiction to fashion a remedy "pending a determination by the NLRB."

On October 6, 2004 (shortly after losing in

arbitration), Peerless filed an unfair labor practice charge with the NLRB claiming that the Union had "attempted to coerce and restrain Peerless . . . with an object of forcing or requiring Peerless to assign work that Peerless does not control to its employees by resorting to arbitration to enforce an unlawful 'work preservation' clause contained in a collective bargaining agreement."

An Administrative Law Judge ("ALJ") was assigned to the matter and a hearing date set. Prior to the hearing, the Union subpoenaed all documents relating to Peerless's use of non-Union personnel to move freight, including agreements with Diageo, and any documents relating to meetings or discussion with Diageo concerning the movement of freight. Peerless petitioned to revoke the subpoena, but offered to produce a redacted version of the Distribution Agreement. After reviewing (*ex parte*) the full, unredacted version of the Distribution Agreement, the ALJ directed Peerless to turn over the unredacted version to the Union because "it was arguably relevant to the Union's defense and . . . it might lead to other information that could be useful."

Peerless did not comply with the ALJ's directive. On March 30, 2005, the ALJ closed the hearing and dismissed

7

Peerless's complaint because "[Peerless's] attorneys decided [not to] turn over information that could possibly be used by the Union in support of its defense."

Upon initial review by the NLRB, the Board found that the ALJ "abused his discretion by imposing the harsh sanction of dismissal against [Peerless for] refusal to fully comply with the subpoena." Instead of the "unusual, and perhaps unprecedented, step of dismissing the complaint," the Board suggested (among other things) that the ALJ draw an adverse inference against Peerless for its refusal to comply and then reach the complaint on the merits. The NLRB ordered the complaint reinstated and the case remanded for a decision on the merits.

On remand, the ALJ dismissed the Peerless complaint on the merits. He concluded that because Peerless was the economic beneficiary of the delivery change and failed to demonstrate that Diageo alone made the decision to assume delivery responsibilities, Peerless could not be considered a neutral, unoffending party and could not be said to lack control of the decision.

Peerless filed exceptions, and the decision went back to the NLRB for final review. On May 11, 2007, a divided

8

Board reversed the ALJ and ruled that the Union violated Section 8(e) by seeking to enforce its collective bargaining agreement with the object of forcing Peerless to cease doing business with Diageo. The majority concluded that "Diageo's contractual authority included the right to insist that it deliver the beverages to Peerless as a condition of sale and Peerless, by agreeing to those terms, lost the right to control the disputed work." The NLRB ordered the Union to: (1) cease and desist from attempting to enforce the collecting bargaining agreement as against Peerless and Diageo; (2) withdraw its grievance; and (3) "[r]eimburse Peerless . . . for all reasonable expenses and legal fees, with interest, incurred in defending against the grievance and arbitration demand."

The dissenter opined that Peerless, by entering the Distribution Agreement with Diageo, "contracted away its right to control [freight movement] work." In her view: "Diageo did not insist, as a condition of continuing to do business with Peerless, that Diageo employees make deliveries formerly handled by [the Union]"; Peerless therefore should have attempted to discuss or negotiate an arrangement with Diageo whereby Peerless's Union employees

9

would continue to move the freight, and its failure to do so rendered Peerless an offending employer. This appeal timely followed.

**II**

Section 8(e) provides that "[i]t shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement . . . whereby such employer . . . agrees . . . to cease doing business with any other person." 29 U.S.C. § 158(e). The provision controls anti-competitive activity in the labor context by barring so-called "secondary boycotts," i.e., "union pressure directed at a neutral employer the object of which [is] to induce or coerce him to cease doing business with an employer with whom the union [is] engaged in a labor dispute." Nat'l Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 621-22 (1967).

To decide whether an agreement is illegal under Section 8(e), the Supreme Court classifies agreements as primary or secondary. NLRB v. Int'l Longshoremen's Ass'n, AFL-CIO, 473 U.S. 61, 78-79 (1985); see also Bermuda Container Line Ltd. v. Int'l Longshoremen's Ass'n, AFL-CIO, 192 F.3d 250, 256

(2d Cir. 1999).  Under Section 8(e), primary agreements are generally lawful; secondary agreements, categorically, are not.  See Int'l Longshoremen's, 473 U.S. at 78-79; Bermuda Container Line, 192 F.3d at 256.  "The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-à-vis* his own employees."  Nat'l Woodwork, 386 U.S. at 645.  "'[I]f the object of the agreement is to benefit the employees of the bargaining unit represented by the union, it is "primary" and . . . does not fall within the proscription of § 8(e) . . . .'"  Bermuda Container Line, 192 F.3d at 256 (quoting A. Duie Pyle, Inc. v. NLRB, 383 F.2d 772, 776 (3d Cir. 1967) (footnote omitted)).  If, however, "'the object [of the agreement] is the application of pressure on an outside employer in order to require [it] to accede to union objectives[,] it is "secondary" [in nature]'" and prohibited by Section 8(e).  Id. (quoting A. Duie Pyle, 383 F.2d at 776).

One type of primary agreement (permissible under Section 8(e) if it meets certain criteria) is a "work preservation agreement."  See Int'l Longshoremen's, 473 U.S. at 78-79.  Such an agreement reserves to a union's members

11

the jobs that they have performed historically. To determine whether a work preservation agreement is lawful under Section 8(e), courts consider whether an agreement: (1) is "aimed at preserving work that union-represented employees in the bargaining unit traditionally perform," and (2) is "directed at work over which the contracting employer has [a right of] control." Bermuda Container Line, 192 F.3d at 256 (citing NLRB v. ILA, 447 U.S. 490, 504-05 (1980)). Equity has bearing upon the second consideration; only an unoffending, neutral employer can effectively disclaim control. An employer may not engage in affirmative conduct that it "reasonably conclude[s] would conflict with [its] collective-bargaining obligations." Int'l Bhd. of Elec. Workers, Local Union No. 501, AFL-CIO, 216 N.L.R.B. 417, 417 (Jan. 31, 1975), enforced, 566 F.2d 348, 353 (D.C. Cir. 1977)).

**III**

Here, it is clear enough that the Union seeks to preserve work that its members have traditionally performed. So the question is whether Peerless had a "right of control" over the disputed work. The Union argues that substantial

evidence is lacking to support the NLRB's determination that: (1) Peerless "lost" its right of control over the movement of freight; (2) Peerless is an unoffending employer; and (3) the Union is attempting to force Peerless to cease doing business with Diageo.

"[W]e uphold the NLRB's finding of fact if supported by substantial evidence . . . and the NLRB's legal determinations if not 'arbitrary and capricious.'" Long Island Head Start Child Dev. Servs. v. NLRB, 460 F.3d 254, 257 (2d Cir. 2006) (citing Universal Camera Corp. V. NLRB, 340 U.S. 474, 477 (1951) and quoting Laborers' Int'l Union of N. Am., AFL-CIO, Local 104 v. NLRB, 945 F.2d 55, 58 (2d Cir. 2001)). Even if we disagree with the Board's factual conclusions, we may reverse on this basis only if, considering the record as a whole, "no rational trier of fact could reach the conclusion drawn by the Board." NLRB v. Albany Steel, Inc., 17 F.3d 564, 568 (2d Cir. 1994) (internal quotation marks omitted). We cannot "displace the Board's choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] de novo." NLRB v. G & T Terminal Packaging, Co., 246 F.3d 103, 114 (2d Cir. 2001)

(alterations in original) (quoting Universal Camera Corp., 340 U.S. at 488). "This court reviews the Board's legal conclusions to ensure that they have a reasonable basis in law. In so doing, we afford the Board 'a degree of legal leeway.'" NLRB v. Caval Tool Div., Chromalloy Gas Turbine Corp., 262 F.3d 184, 188 (2d Cir. 2001) (quoting NLRB v. Town & Country Elec., Inc., 516 U.S. 85, 89-90 (1995)).

(A) Right of Control

As the NLRB majority found, there is no evidence that Peerless initiated the change in Sales Terms: "The most that can be said is that Peerless did not actively resist it." Peerless was already bound by contract to accept Diageo's unilateral changes; so once the Delivered Pricing change was announced, Peerless's only options were to accept the change (thereby offending the Union), or to refuse to continue doing business with Diageo (thereby exposing itself to suit for breach of contract). The Union therefore cannot demonstrate that Peerless was in a position to control the allocation of work.

(B) Unoffending Employer

The Union argues that Peerless was an "offending employer" because: (1) it bargained away the right to make

14

delivery decisions; and (2) it refused to comply with a subpoena for documents concerning the negotiations.

      1. <u>Delivery Decisions.</u>  The Agreement (which was reviewed *ex parte* by the ALJ) contains no express provision allocating the work of delivery, and the Union continued to deliver for six months following the Agreement.  As the NLRB majority therefore ruled, Peerless could not "'reasonably conclude' that its acceptance of [the Distribution Agreement] conflicted with its obligation [to the Union] under its collective-bargaining agreement."

Moreover, there is no indication that Peerless affirmatively sought a provision yielding to Diageo unilateral authority to change the terms of sale.  The Union's argument that Peerless initiated the change is wholly speculative and implausible; it assumes that Diageo rolled out a national pricing program in response to Peerless's desire to idle its own drivers.

Substantial evidence--including the testimony of witnesses and the text of the Distribution Agreement--supports the findings that Peerless and Diageo did not discuss delivery, that Peerless bargained away its right of control over a bundle of rights--designated the "sales

terms"--without foreseeing a change in delivery terms that might be adverse to the Union, and that Peerless was, therefore, an unoffending employer.[1]

At best, the Union asserts that Peerless did not negotiate with sufficient effort, foresight and resourcefulness to preserve the Union's work.  However, this line of argument has been rejected by courts and the NLRB. See Int'l Bhd. of Elec. Workers, 216 N.L.R.B. at 418 ("[T]o define the parameters of 'unoffending employer' based solely on an expenditure of effort on the part of the employer seeking the Act's protection seems realistically futile, as well as administratively unmanageable.").

Under these circumstances, Peerless was not an "offending employer" and was therefore entitled to the Act's protections.

2. Subpoena Compliance.  The Union attacks the root of the NLRB's findings by citing the refusal by Peerless to produce evidence as to whether Peerless actively bargained away the Union drivers' rights.  The subpoena at

---

[1] We express no view as to whether Peerless would have offended the collective bargaining agreement if it foresaw the issue of control and sought to preserve it in negotiation, but failed.

16

issue required Peerless to produce the Agreement and/or other documents related to the negotiation.  As to the Agreement itself, the NLRB evidently decided on a basis as to which the known terms were sufficient.  As to the supposed failure of Peerless to produce documents reflecting negotiations on the movement of freight, Peerless's witnesses testified that the movement of freight was never discussed or negotiated, and it is not specifically addressed in the Distribution Agreement.

(C) <u>Union Objectives</u>

The Union also argues that its actions were permissible under Section 8(e) because it was not the Union's object to effectuate a secondary boycott against Diageo by enforcement of its bargaining agreement with Peerless.

Insofar as the Union complains that Peerless failed to protect its drivers' right to move freight, the Union's grievance would seem to be with Peerless, not Diageo.  But it is also true that the enforcement of the collective bargaining agreement that the Union sought in this particular case would have effected a secondary boycott of Diageo.  The Union's position would likely either preclude Peerless from doing business with Diageo entirely, or

obligate Peerless to breach its contract with Diageo. Both scenarios violate Section 8(e)'s bar on agreements that effect the cessation of business, and both are in tension with Section 8(e)'s aim of eliminating anti-competitive conduct. See Nat'l Woodwork Mfrs., 386 U.S. at 620 (noting that Section 8(e)'s "history begins with judicial application of the Sherman Act to labor activities") (citation omitted).

This Court must defer to the findings of the NLRB as long as they are supported by substantial evidence and the legal conclusions are not arbitrary or capricious. Long Island Head Start, 460 F.3d at 257. All of the majority's findings here are supported by substantial evidence because, based on the record, they are not without foundation, while the arguments of the Union and the NLRB dissent are speculative and unsupported by the record. Accordingly, we affirm the NLRB's decision with respect to Section 8(e).

**IV**

The Union appeals the NLRB's decision to award Peerless reimbursement for expenses and legal fees incurred while defending the Union's grievance and arbitration demand.

18

In fashioning a remedy, the NLRB is authorized "to take such affirmative action . . . as will effectuate the policies of [the NLRA]." 29 U.S.C. § 160(c). "[A] remedial order of the Board 'will not be disturbed unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the [NLRA].'" TNT USA Inc. v. NLRB, 208 F.3d 362, 367 (2d Cir. 2000) (quoting Fireboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 216 (1964)).

Peerless withheld a copy of its Distribution Agreement from the Union in defiance of a subpoena and an order of the ALJ. By so doing, it called into question whether it was forthcoming in producing other documents. It may be that Peerless had its reasons: an employer may wish to shield its business contracts from a union. But the effect was to withhold a document containing information without which the Union could not independently assess its grievance or consider whether the arbitration was moot. The award of attorneys' fees in this case casts upon the Union the costs and expenses of proceedings that were (at least) prolonged by the employer's defiance of a discovery order. It is difficult to see how the award in this case, which affords

19

an incentive to disregard discovery mandates, can "fairly be said to effectuate the policies of the NLRA." Id. The remedy fashioned also has the effect of discouraging the filing of grievances that may be meritorious, an end which is squarely at odds with the policies of the NLRA. Accordingly, the NLRB's decision to award fees to Peerless is reversed.

## CONCLUSION

For the foregoing reasons, the Union's petition for review is granted with respect to attorneys' fees and the award reversed; in all other respects, the Union's petition for review is denied and the NLRB's cross-petition for enforcement is granted.

20